Earl E. WEST, individually, and on behalf of all unconvicted persons who are, or may be, inmates in the Las Vegas Metropolitan Police Department jail system; Jack McAllister, individually, and on behalf of all persons who are, or may be, inmates in the Las Vegas Metropolitan Police Department jail system, and who

are incarcerated for the service of any sentence of conviction or violation of parole or probation, Plaintiffs–Petitioners,

and

United States of America, Plaintiff–Intervenor,

v.

Ralph J. LAMB, in his capacity as Sheriff of Clark County, Nevada, and as Chairman of the Las Vegas Metropolitan Police Commission; and Manuel Cortez, Sam Bowler and David Canter, in their official capacities as members of the County Commission for the County of Clark, Nevada, and as members of the Las Vegas Metropolitan Police Commission; Ron Lurie, Myron Leavitt and Paul Christensen, in their official capacities as members of the City Commission of the City of Las Vegas, Nevada, and as members of the Las Vegas Metropolitan Police Commission; William Briare, in his capacity as Mayor of the City of Las Vegas; Roy Woofter, in his capacity as a member of the City Commission of the City of Las Vegas, Nevada, and Thalia M. Dondero, R. J. Ronzone, Jack R. Petitti and Robert N. Broadbent, in their capacity as members of the County Commission for the County of Clark, State of Nevada, Defendants–Respondents.

No. Civil LV 77–118 RDF.

United States District Court,

D. Nevada.

Aug. 22, 1980.

Oscar B. Goodman, Las Vegas, Nev., Kenneth C. Cory, Fed. Public Defender, Brent T. Adams, Asst. Fed. Public Defender, Las Vegas, Nev., for plaintiffs–petitioners.

B. Mahlon Brown III, U. S. Atty., Las Vegas, Nev., Charles Ory, Sp. Litigation, Dept. of Justice, Civil Rights, Washington, D. C., for plaintiff–intervenor.

R. J. Miller, Dist. Atty., by Stanley W. Parry, Deputy Dist. Atty., Las Vegas, Nev., for defendants–respondents, Clark County Commissioners Cortez, Bowler, Canter, Dondero, Ronzone, Petitti and Broadbent.

George Ogilvie, City Atty. by John H. Howard, Jr., Deputy City Atty., Las Vegas, Nev., for defendants–respondents, Mayor William Briare, City Commissioners Lurie, Leavitt, Christensen and Woofter.

Gary D. Lang, Legal Adviser Metropolitan Police Dept., Las Vegas, Nev., for defendant–respondent, Sheriff John D. McCarthy (replaced Ralph J. Lamb through election).

ORDER FIXING MAXIMUM INMATE POPULATION FOR LAS VEGAS METROPOLITAN POLICE DEPARTMENT JAILS AND REQUIRING SUBSTANTIALLY FULL COMPLIANCE WITH CONSENT DECREE

ROGER D. FOLEY, District Judge.

*POPULATION LIMITED TO 178 INMATES*

The plaintiffs' motion for a preliminary injunction to limit the population of the subject jails, that is, those jails under the jurisdiction of the Sheriff of Clark County, Nevada, and the Metropolitan Police Commission, is granted. The motion for the appointment of a special master is denied. Until further order of this Court, the maximum population that may be housed in the subject jails is 178 inmates, 144 inmates in the jail in the Clark County Courthouse (Central Detention), and 34 inmates in the jail in Las Vegas City Hall (Annex).

*THIS CLASS ACTION*

Plaintiffs filed their first amended complaint, a class action, against the defendants on August 9, 1977, alleging that the inmates were confined in the subject jails (Central Detention and Annex) under conditions which are oppressive, barbaric, degrading and dangerous to their lives, health and safety and violative of their basic rights as citizens and human beings, thereby depriving inmates of their rights under the Constitution and laws of the United States.

*JURISDICTION*

This Court has jurisdiction under Title 28, U.S.C., § 1343(3); Title 42, U.S.C., §§ 1983 and 1988; and Title 28, U.S.C., §§ 2201 and 2202.

*ORDER DETERMINING CLASS*

On August 11, 1977, this Court, pursuant to Rule 23, Federal Rules of Civil Procedure, entered its order determining there to be two classes of persons parties plaintiff:

"(1) The class of persons on behalf of whom plaintiff Earl E. West sues (John Capel should not represent this class because he has been discharged from custody), consisting of all persons who are, or may in the future be, confined in the Clark County Jail or City Jail Annex and who are not or will not be incarcerated for the service of any sentence of imprisonment imposed by any court of any state or the United States.

"(2) The class of persons on behalf of whom plaintiff Jack McAllister sues consisting of all convicted persons who are, or may be, confined in the Clark County Jail or the City Jail Annex as the result of the conviction of any offense or the revocation of parole or probation."

*UNITED STATES INTERVENOR, ADDITIONAL PARTIES NAMED*

The petition of the United States to intervene as a party plaintiff was granted on February 21, 1978. An amendment to the first amended complaint was allowed by this Court on April 5, 1978, adding certain

defendants who were not members of the Metropolitan Police Department.[1]

## CLARK COUNTY GRAND JURY REPORTS

There is in evidence in this case the report of the 1975 Clark County grand jury and the report of the 1977 Clark County grand jury relative to jail conditions in Clark County, Nevada.

## THE 1975 CLARK COUNTY GRAND JURY REPORT

The 1975 Clark County grand jury noted that the Central Detention facility was overcrowded, unsanitary, inadequately staffed and dangerous to the lives and health of the inmates. The grand jury noted that inmates with emotional problems could not be hospitalized at Southern Nevada Memorial Hospital because of lack of security at the hospital and hence they were detained in the Central Detention facility. The grand jury was alarmed that inmates with mental or emotional problems were being detained under inhuman and deplorable conditions in cells designed for discipline and isolation at the Central Detention facility. The grand jury reported that juveniles were found associating and mingling with adult prisoners, contrary to Nevada laws; that unconvicted persons were housed with felons convicted of very serious crimes; that racial segregation was being practiced. The 1975 grand jury reported that cell blocks were dirty, blankets and mattresses were unsanitary, showers dirty, toilets inoperative and unsanitary and subject to transmittal of communicable diseases; that ventilation (air conditioning) was inadequate, insufficient fresh air to prevent stench; that existing air was recirculated throughout the Courthouse system. The grand jury noted that medical attention to the inmate population was unsatisfactory; that there was inadequate opportunity for inmates to be examined on sick call; that a doctor was not available on a daily basis; that there was too much diagnostic responsibility placed on nurses, and there was no supervision of correctional officers' decisions as to whether inmates should be allowed to report for sick call; that no medical examination was given to new inmates upon being received into the jail. The grand jury found that emergency conditions existed and recommended:

1. That the Annex in the Las Vegas City Hall (then not in use) be used to house inmates. (Use of the Annex began during 1976);

2. *That immediate steps be taken to erect a new jail facility,* designed to accommodate separately those prisoners in need of psychiatric treatment, medical treatment and protective custody, and in no case should those unconvicted be housed with those convicted.

## THE 1977 CLARK COUNTY GRAND JURY REPORT

The following is quoted from the 1977 Clark County grand jury report:

"B. Clark County Jail, City Annex, Southern Nevada Memorial Hospital Jail Ward

Based on investigation, it is our finding that the existing Clark County Jail and City Annex are <u>extremely inadequate, deplorable, demoralizing, dirty, dilapidated, and dangerous. Within these facilities, various conditions exist which result in numerous homosexual assaults, inmate fights, and riots, with physical violence causing severe injuries and deaths. This situation is critical and warrants the immediate attention of the Metropolitan Police Commission because of the continuing extremely hazardous atmosphere within these jails.</u>

"The major areas of <u>immediate</u> concern are enumerated as follows:

---

1. The Metropolitan Police Commission Act was enacted by the Nevada Legislature and became effective in 1973, *Nevada Revised Statutes* 280.010–280.360. Prior to the effective date of 1977 amendments, *NRS 211.010* and *NRS 211.020* made it the duty of the Board of County Commissioners of each county in Nevada to maintain, supervise and inspect county jails. By 1977 statutes, page 367, *NRS 211.010* and *NRS 211.020* were amended to impose the same responsibilities upon metropolitan police commissions where applicable, as in Clark County.

"1. The Clark County Jail and City Annex are currently over-crowded. Their combined capacity is 550, but they have recently held as many prisoners as 674. This results in hardened criminals, one-time offenders, violators found guilty, those not yet tried, juveniles that have been certified as adults, those accused of misdemeanors, those accused of felonies, blacks, whites, young, old, drunks, those that are mentally ill, and people being kept in protective custody being all housed together – like cattle in sixty-man cell blocks – with very little separation and no surveillance measures (e. g. cameras) in the cell areas.

"These shocking conditions lead to extensive physical abuse and violence, including numerous riots, fighting, homosexual assaults, and rape. The large numbers of physical injuries, emotional disturbances, and deaths that result from this violence cause substantially increased costs to the tax-payers. These soaring expenses result from: the increased personnel needed to break up the disturbances and transport prisoners to the hospital for medical treatment; the costs of transportation to and from the hospital everyday; the tremendous expenses of medical care (hospital charges, physician's charges, examination and special test charges, and medication charges) at the jail and at the hospital for every prisoner who is treated; the considerable amount of time that is involved in attempting to handle these problems; and the law suits with which the County and City are faced.

"2. The number of cells, toilets, showers, beds, linens, clothing, and shoes are insufficient for the number of prisoners that are housed in the jail. The cell blocks are dirty and unsanitary. The toilets and showers are unsanitary; and, therefore, provide a possibility for transmittal of communicable diseases. Many are inoperative. The beds, linen, clothing, and shoes are seldom, and not thoroughly, cleaned to prevent communicable disease transmission. Ventilation is inadequate and this causes a foul odor throughout the jail." (Underscoring provided.)

The 1977 grand jury further complained of:

1. Inadequate training of correction officers;

2. An insufficient number of correction officers;

3. No special diet for diabetic inmates and others;

4. No area for physical exercise;

5. No opportunity for religious practices;

6. Inadequate medical care;

7. No jail ward for psychiatric inmates at Southern Nevada Memorial Hospital.

The 1977 grand jury recommended: The "immediate construction of a completely new jail facility to include:

"1) Only one- and two-man cells;

"2) a hospital ward;

"3) psychiatric care facilities;

"4) exercise areas;

"5) religious areas;

"6) recreational and athletic areas; and

"7) extensive security measures;

all within the requirements and guidelines of the federal system. It is our opinion that it will be necessary, in the future, to be able to house an increasing number of inmates, due to the incidence of rising crime that the Las Vegas area is experiencing because of its increasing growth. Therefore, the new facility should allow for a continuous increase, projected well into the future.

"We feel that a new facility is imperative; and we are concerned about the procedure and method being used, at present, to obtain such a facility. Because of our genuine concern for these problems, we respectfully request the opportunity to meet with the involved parties and discuss the planning of a new jail facility.

"Respectfully submitted,"
(Underscoring provided.)

The reports of the 1975 and 1977 Clark County grand juries were ignored. With minor exception, the pain and suffering, yes! the cries of the inmates for human decency, made so eloquently for them by their advocates the members of the 1975 and 1977 Clark County grand juries, fell upon the deaf ears of the Metropolitan Police Commission and upon all the members of the Las Vegas City Commission and of the Board of Commissioners of Clark County. Although he did virtually nothing for years to solve jail problems, former Sheriff Ralph Lamb did report the need for jail facilities to the Board of County Commissioners and Metropolitan Police Commissioners.

## THE DISCOVERY PHASE

Recognizing that if the allegations of plaintiffs' first amended complaint, and if the 1975 and 1977 Clark County grand juries' findings were proven to be true, the inmates in the subject jails had long been, and would for some substantial period of time in the future continue to be, deprived of their rights under the Constitution and laws of the United States, this Court made an effort to expedite the discovery phase of this case by directing its Magistrate to personally preside over the taking of the depositions of witnesses for both the plaintiffs and the defendants. Because of the excellent work of U. S. Magistrate Joseph M. Ward and the cooperation of counsel, all of the depositions were taken between March 1, 1978, and May 19, 1978.[2]

2. The depositions taken in this action are as follows:

1. Deposition of RALPH J. LAMB, taken March 1, 1978;
2. Deposition of WILLIAM O. CONGER, taken March 3, 1978, and March 6, 1978;
3. Deposition of PAUL S. GOLDMAN, taken April 14, 1978;
4. Deposition of WILLIAM McINTOSH, taken April 12, 1978;
5. Deposition of DOUGLAS ALAN HENDERSON, taken April 24, 1978;
6. Deposition of ARNOLD E. PONTESSO, taken April 14, 1978;
7. Deposition of JEAN RAMBO, taken April 19, 1978;
8. Deposition of KENT HOKANSON, taken March 8, 9 and 10, 1978;

## CONSENT DECREE

On July 19, 1978, plaintiffs and Sheriff Ralph Lamb signed a proposed Consent Decree in an effort to settle this class action. On September 14 and September 20, 1978, other defendants joined the Sheriff by executing the proposed Consent Decree. On September 29, 1978, the Court entered its order giving notice of the proposed Consent Decree to the two classes of persons parties plaintiffs and scheduling a hearing for October 23, 1978, to approve or disapprove the proposed Consent Decree.

On October 23, 1978, after considering the views of the members of the class and the statements of counsel for all the parties, this Court approved the Consent Decree.

The Consent Decree provides at its inception:

### "TITLE I.

### "BASIS FOR THIS CONSENT DECREE

"1. The plaintiffs, plaintiff–intervenor and defendant Sheriff hereby agree and represent to the Court that the evidentiary basis for this Consent Decree is established by the testimony heretofore taken in depositions presently lodged with the Clerk of the Court, all exhibits thereto, and the documentary materials to date supplied by the defendants during the discovery phase of this action.

"2. For purposes of this decree and its enforcement, all evidence of whatever nature contained in the foregoing depositions, exhibits thereto and documentary

9. Deposition of RICHARD DELLA PENNA, taken May 10, 1978;
10. Deposition of WILLIAM NAGEL, taken May 8, 1978;
11. Deposition of GERALD E. WILLIAMS, taken June 5, 1978;
12. Deposition of MAGDALENA McKENRICK, taken April 12, 1978;
13. Deposition of SAMUEL W. HOOVER, taken April 20, 1978, together with exhibits thereto;
14. Deposition of RICHARD EUGENE FOX, taken on April 24, 1978;
15. Deposition of F. WARREN BENTON, taken May 19, 1978.

materials may be admitted into evidence for purposes of this Consent Decree and its enforcement only, subject to the legal objections of record made during the taking of the aforesaid depositions.[3]

"3. Due to the resolution by settlement between and among the undersigned parties of the issues raised herein, it is not necessary for the Court to enter findings of fact and conclusions of law. However, this Consent Decree is intended to remedy the conditions of confinement in the subject jails, which conditions have been alleged to deny the individuals therein confined certain rights, privileges and liberties, and the equal protection of the laws, all of which are secured and guaranteed to them by the Constitution and laws of the United States and of the State of Nevada, which allegations are denied by the defendants.

"4. This Consent Decree is executed by the parties hereto for the purpose of resolving this action. It is expressly understood and agreed, as a condition hereof, that this Consent Decree shall not constitute or be construed to be an admission on any part of the defendant Sheriff, or as evidencing or indicating in any degree an admission of the truth or correctness of any claim asserted or of any violation of law alleged.

"5. This Consent Decree is presented to the Court at this time in order to more speedily remedy the conditions of the subject jails and to avoid delay in the implementation of the remedial provisions herein. Because of the nature of the relief, the Court shall retain jurisdiction herein until such time as the Court is satisfied that all terms of the Consent Decree have been fully implemented and that further supervision by the Court is therefore unnecessary.

"6. All parties to this Consent Decree submit to the jurisdiction of the Court for the purpose of this Order and its implementation and enforcement."

3. On October 23, 1978, this Court overruled all objections made of record during the taking of the said depositions.

The Consent Decree concludes in part as follows:

"TITLE III.

"IMPLEMENTATION OF THIS CONSENT DECREE

"1. All parties to this Consent Decree hereby recognize and submit to the continuing jurisdiction of the Court until it is determined, by Order of the Court, that each and every provision of this Consent Decree has been fully implemented and that the continuing jurisdiction of the Court is therefore not necessary. At such time as the Court finds that all provisions of this Consent Decree have been implemented by the defendant Sheriff, to the satisfaction of the Court, and that, therefore, continuing jurisdiction of this Court is unnecessary, the Court shall enter final judgment in this action.

"2. Defendant Sheriff hereby agrees to undertake each and every lawful act, execute all necessary documents, perform all necessary official acts, make all necessary directives and orders to subordinates, expend or authorize the expenditure of all necessary funds, and take whatever other actions and of whatever nature, are necessary to fully implement each and every provision of this Consent Decree as soon as possible.

"3. Insofar as possible, each and every provision of this Consent Decree shall be forthwith implemented by the defendant Sheriff. All of the foregoing substantive provisions of this Consent Decree shall be contained and embodied in written policies and procedures which shall be kept and maintained on the premises of the subject jails. The defendant Sheriff shall, within sixty days subsequent to the effective date hereof, submit a written report (plan) for each substantive area mentioned above to the Court and to counsel for plaintiffs and plaintiff–intervenor in this action setting forth in detail the manner, method and means by which

the provisions of this Consent Decree have been implemented, a timetable for complete and final implementation and, where applicable, certifying that the implementation thereof has been accomplished.

"4. In addition to and as part of the plan referred to in preceding paragraph 3, as to any provision of this Consent Decree which the defendant Sheriff may claim is impossible to implement, the Sheriff shall submit to the Court and counsel for plaintiffs and plaintiff–intervenor, within sixty days subsequent to the effective date hereof, a written report setting forth the following:

"(a) The precise provision or provisions of this Consent Decree which cannot be immediately implemented;

"(b) The reason or reasons why any such provision cannot be immediately implemented;

"(c) A detailed plan for the implementation of any provision as soon as possible;

"(d) An estimate of the time necessary to fully implement any such provision;

"(e) If it is contended that any such provision of this Consent Decree cannot under any circumstances be implemented in the subject jails, the reason why full implementation of any such provision is impossible; and

"(f) Thereafter, if any plan for implementation, previously approved by the Court, becomes manifestly impossible of performance due to circumstances beyond the control of the defendant Sheriff, and which could not be reasonably foreseen at the time of the Court's approval of said plan, the Sheriff may seek appropriate relief from the Court. Any such application for relief shall be accompanied by an alternative plan for implementation, which shall be subject to approval by the Court.

"5. As to the report, plan and implementation schedule which defendants are required to submit for each of the substantive areas of this Consent Decree, counsel for the plaintiff and plaintiff–intervenor shall have thirty days to object to the report/plan/implementation schedule of each of the substantive areas.

"6. In any event, at a time no later than ninety days subsequent to adoption of this Decree by the Court, the Court shall set a hearing before the Court, at which time the defendant parties hereto and counsel shall present to the Court a report concerning their plans by subject area, the extent to which the provisions of this Consent Decree have been already implemented, and all measures to be prospectively taken by such defendants and/or at their direction to implement every provision of this Consent Decree. At the hearing, the Court shall determine if defendants' plans, reports and implementation schedule are sufficient to fully implement the provisions of the Consent Decree as soon as possible. This hearing is to focus on the adequacy of defendants' plans and not on the actual measure of compliance.

"7. It is fully understood and agreed by and between the parties to this Consent Decree that economic considerations shall not be deemed to be an excuse or a justification for the failure of any party hereto to comply with any provision of this Consent Decree."

In accordance with Consent Decree Title III, there was filed herein by Sheriff Ralph Lamb on December 21, 1978, "DEFENDANT SHERIFF'S IMPLEMENTATION PLAN." Later on, with the Court's approval, there was filed by Sheriff John D. McCarthy on March 9, 1979, the "DEFENDANT SHERIFF'S IMPLEMENTATION PLAN AS MODIFIED." [4] The modified plan superseded the earlier–filed implementation plan. After objections to the modified implementation plan were filed as provided in Consent Decree Title III, this Court conducted a hearing on the implementation plan and objections thereto as provided for in Consent Decree Title III.

---

4. John D. McCarthy took the office of Sheriff of Clark County, Nevada, in January of 1979, having defeated Ralph Lamb in November 1978.

*HEARING OF APRIL 30, 1979*

At the hearing held on April 30, 1979, plaintiffs' counsel stated his belief that the Consent Decree could not be implemented in the subject jails without this Court severely limiting inmate population to approximately 200 inmates. Plaintiffs' counsel further pointed out to the Court that although Sheriff McCarthy had made a very impressive beginning, had acted in good faith, was aggressive, sincere and cooperative, yet unless approximately two-thirds of the inmates were removed, the Consent Decree would not be implemented in the subject jails.

Plaintiffs' counsel also expressed his belief that the defendant City and County Commissioners intend to react to the financial requirements for the implementation of the Consent Decree in the subject jails in the usual and ordinary course of business, the same as in the case of any other City and County agencies. Plaintiffs' counsel stressed that money needed to implement the Consent Decree must be furnished by the defendant Commissioners on an emergency basis and not in the usual and ordinary course of business. Plaintiffs' counsel suggested that the Court name a special master to monitor the defendants' progress toward compliance with the Consent Decree. Plaintiffs' counsel further advised the Court that no firm plans yet existed for a new jail or for the renovation of the subject jails in order to implement the Consent Decree.

County counsel, noting that the County defendants in general agreed with the Sheriff's modified implementation plan, sought more time for the new Sheriff to study the entire problem. County counsel asked the Court to allow the defendants more time to study and to propose long range medical service plans, a pretrial release program, and plans for major reconstruction or new construction. County counsel advised the Court that an architect and jail consultant had been hired since the suit had been filed, that the firm of Cambeiro & Cambeiro and Michael F. Wong had been retained as architects. County counsel advised that the architects had prepared some preliminary plans for a new jail. Counsel notes that there is some question as to whether the plans for a new jail comply with the Consent Decree. Counsel further advised that the defendants needed more time to ascertain the needs, costs, site selection and financing, including the question of a bond issue for a new jail, and to suggest a timetable for all of the same.

City counsel took issue, as had County counsel, with the statement of plaintiffs' counsel that the situation in the subject jails is worse now (April 30, 1979) than when the case began in mid–1977. City counsel noted that in addition to funding the architects' plans for a new jail, the Metropolitan Police Commission had approved the hiring of a professional jail administrator; have set aside funds for improvements; have cooperated in seeking federal funds for the implementation of the pretrial release program; have sought the advice of nationally recognized corrections experts; and in general have recognized the need for professionalism in meeting the problems in this case. City counsel stressed the need to educate the public and public officials and public boards in order to begin to solve the Metropolitan Police Department's jail problems. City counsel noted a change in attitude on the part of the defendants and other affected public officials and public bodies that impact upon the jail population; that there is no foot–dragging, that there exists a new spirit of cooperation to solve the complex and difficult problems this case presents. *City counsel argued that full implementation of the Consent Decree cannot be expected in the subject jails but must await a new jail.*

Counsel for Sheriff McCarthy spoke to the Court about the zeal with which the new Sheriff has attacked the problems in the subject jail and, principally, the need for a professional jail administrator, for a medical expert, and, of course, for a new jail. Counsel for the Sheriff voiced his opinion that medical services to the inmates are being improved and stressed the approval of a pretrial release program. The

Sheriff's counsel stated that every expert consulted had advised that the *cost per inmate for renovating the old facility far exceeds the cost per inmate for the building of a new facility.* When asked by the Court about the inmate population problem, the Sheriff's counsel stated that it was overwhelming and saw the remedy in a new jail. The Sheriff's counsel cautioned the Court against a premature population reduction as being contrary to the public interest and contrary to public safety and stated further that too early a population reduction could create an adverse voter reaction to any future bond issue election for a new jail. Counsel opposed as unnecessary the appointment of a special master to implement the Consent Decree.

Sheriff McCarthy spoke to the Court personally. He reviewed his efforts in attempting to solve the Metropolitan Police Department's complex jail problems in Southern Nevada. The Sheriff stressed the need for the active support of all elected and appointed officials involved in the criminal justice system in Southern Nevada, noting that the defendants in this case "were on the point of the spear." He spoke of the need for public education about conditions in the subject jails and the absolute need for new facilities, preparatory to placing a bond issue for a new jail on a future ballot. The Sheriff presented the Court with a bar graph visually demonstrating the implementation status subsection by subsection of the *239 provisions of the Consent Decree.*

### ORDER OF AUGUST 24, 1979

On August 24, 1979, this Court entered the following order:

"The Sheriff's plan, filed March 9, 1979, to implement the consent decree is approved, although the Court believes there is merit in some of the objections made to the plan. The implementation plan, like the consent decree itself, consists mostly of promises of future performance by the defendants which, when performed, will assure that the prisoners in the Clark County Jails are accorded their full constitutional rights.

"Counsel for the Sheriff and counsel for all of the other defendants are directed to file with this Court by November 1st, 1979, written reports reflecting the progress to date of the Sheriff and all of the other defendants in bringing jail conditions into compliance with the consent decree and, in addition, the defendants' estimation of when they expect to comply fully with the requirements of the consent decree. These reports should contain an update of the 'Consent Decree Implementation Schedule–by Provision' presented by the Sheriff himself in open court during the hearing on the implementation plan on April 30, 1979.

"Counsel for the plaintiffs' class and for the intervenor United States will have until January 2nd, 1980, to respond in writing to the written response of the defendants.

"A hearing will be held on the defendants' reports and the plaintiffs' and intervenor's response thereto on January 14th, 1980, at 9:30 A.M."

Pursuant to the order of August 24, 1979, defendants filed a "CONSENT DECREE IMPLEMENTATION SCHEDULE–REVISED 11/1/79."

### THE JANUARY 14, 1980, HEARING

Pursuant to the order of August 24, 1979, the Court held a hearing on January 14, 1980. The Court had approved the Consent Decree on October 23, 1978. Sheriff McCarthy took office in January of 1980. Only one witness testified on January 14, 1980 – Arnold E. Pontesso. Mr. Pontesso told the Court that he was impressed with Sheriff McCarthy and his staff's professional attitude. He noted that staff training had been improved, that racial integration had been accomplished, that the staff had done much to improve jail conditions and had many plans for future improvements. However, he cautioned that overcrowding is the most important and pressing problem and that there can be no real and substantial improvement without substantial jail population reduction. Although Mr. Pontesso voiced no criticism of the merits of the proposed new medical services and food

services programs, he did complain that they were very expensive. Mr. Pontesso fixed a maximum population for the subject jails at 300 inmates.

Sheriff McCarthy again addressed the Court and, with the candor that is typical of this honest, able and dedicated law enforcement official, advised the Court that the population then of 514 inmates must be reduced to about 350 inmates in order to implement the Consent Decree in the subject jails.

In its extended remarks, this Court noted with dismay that City and County defendants were in litigation in the state court over the constitutionality of the Metropolitan Police Commission Act and that City and County members were differing over site selection for a new jail, over plans and design for the same, over their respective participation in funding the Metropolitan Police Department, as well as over almost everything else of any significance having to do with the financing and construction of the new jail, and the improvement in the subject jails. This Court then invited plaintiffs' counsel to move for a preliminary injunction to limit the population of the subject jails. The Court noted that it could not wait for a new jail whenever it might become a reality (estimates range from three to five years), but must take action to vindicate the constitutional rights of the inmates in the subject jails. The Court suggested that it should reduce the population of the subject jails to at least the extent needed to eliminate unconstitutional confinement, pointing out that each and every provision of the Consent Decree need not necessarily be implemented in order to vindicate the inmates' constitutional rights.[5]

The Court also expressed doubt that the Consent Decree could be fully and completely implemented in the subject jails, although plaintiffs' counsel stated that it could be done. The Court indicated that it may brush aside the arguments that spending money in the subject jails is not cost effective, and require substantially full compliance with the Consent Decree in the subject jails, at least to the extent that is necessary to vindicate the constitutional rights of the inmates.

## THE MOTION FOR THE PRELIMINARY INJUNCTION RE JAIL POPULATION AND FOR THE APPOINTMENT OF A SPECIAL MASTER

On February 29, 1980, the plaintiffs filed their motion, together with affidavits and points and authorities, for a preliminary injunction to limit the population of the subject jails to a maximum of 146 inmates, until such time as additional persons may be confined therein without violating any of the provisions of the Consent Decree. Plaintiffs further moved for the appointment of a special master to assist the Court in enforcing the preliminary injunction and in fully implementing the Consent Decree in the subject jails. On March 28, 1980, the defendants filed jointly a memorandum of points and authorities, together with affidavits and memoranda in opposition to the motion for preliminary injunction and a special master and, on May 2, 1980, filed supplemental affidavits in opposition. On April 2, 1980, the Court admitted into evidence for purposes of the preliminary injunctive relief sought, and the appointment of a special master, all of the depositions and exhibits thereto set forth in Footnote 2 herein. On May 5, 6 and 7, 1980, the Court heard the testimony of witnesses, received additional exhibits into evidence, and took the motions under submission, the evidence before the Court consisting of the deposition set forth in Footnote 2 and the exhibits thereto, the affidavit and other documents attached to the points and authorities in support of and in opposition to the motion for a preliminary injunction and special master, together with the testimony taken on January 14, 1980, and on May 5, 6 and 7, 1980, and the documents received into evidence at the May 1980 hearing.

## THE DEPOSITION TESTIMONY

The deposition testimony given in March, April and May 1978 by several nationally

---

5. Of course having signed the Consent Decree, all defendants are bound to implement each and every provision of the same in the subject jails.

recognized and highly qualified experts[6] in the field of detentions and corrections, each of whom had inspected the subject jails, *paints a sordid picture of brutal, depraved, cruel, uncivilized, inhuman treatment of the inmates in the subject jails.* One of these witnesses actually likened the subject jails to a Nazi World War II concentration camp. These experts indicted the subject jails on a multitude of constitutional counts. They voiced, among others, the following conclusions:

1. Severe inmate overcrowding;

2. All cells and dormitories provide only maximum security housing for all inmates;

3. Racial segregation of inmates;

4. An insufficient number of correction officers, and inadequately paid and trained correction officers;

5. Since inmates pose a danger to correction officers, and since it is nearly impossible for correction officers to perform their duties efficiently, their morale is poor;

6. No trained jail administrator;

7. The design and the manner in which the subject jails are constructed, i. e., the cell and dormitory configurations are fatally flawed;

(a) The hole is brutal and uncivilized (now closed);

(b) Segregation cells are so bad that they should be used only when absolutely necessary;

(c) Proper supervision of inmates for the protection of their lives and their bodies is impossible:

(i) Rapes, homosexual attacks and beatings and other forms of brutality occur regularly by predatory inmates;

(ii) Weaker inmates are victimized in many nonviolent ways by stronger, aggressive inmates;

(iii) Self–appointed stronger inmates act as tank bosses in the dormitories. These tank bosses, rather than the correction officers, are in charge;

(d) Television surveillance is ineffective to inform correction officers of inmate activities and correction officers simply can't observe from TV monitors what inmates are doing;

(e) Proper classification, that is, the legal separation of inmates, is impossible;

8. Health care for the physically and mentally ill is wholly inadequate. It does not meet any recognized public health standards;

9. Fire protection is inadequate. The subject jails are death traps. They do not meet any recognized fire safety standards. Exposed electrical wiring and other electrical hazards exist;

10. There is little natural lighting, and artificial light is insufficient;

11. Noise level is dangerous to hearing and mental health;

12. The heating, cooling and ventilating systems are wholly inadequate to maintain health, let alone bodily comfort;

13. The subject jails are filthy and unsanitary:

(a) There are not enough toilets, wash basins and showers;

(b) Many of the toilets, wash basins and showers are broken down and do not function;

(c) A stench from fecal matter, urine and other body odors permeates the subject jails;

(d) Sewage can be sucked up into the drinking water supply and methane gas can escape from sewer pipes;

(e) Mattresses, pillows, blankets and linens are filthy;

(f) There is insufficient inmate clothing. What there is is dirty, torn and worn out;

(g) Laundry services are very poor;

(h) There is infestation of insects and vermin in the kitchens because of filthy, old food and even fecal matter on the floors;

14. Inmate food services are inadequate, unsanitary and unhealthful;

---

6. The expert witnesses referred to are Arnold E. Pontesso, Dr. Richard Della Penna, William Nagel, Samuel W. Hoover and F. Warren Benton.

15. Poor visitation facilities render it impossible for attorneys to confer fully and confidentially with inmate clients;

16. Visitation facilities for families and friends are not adequate;

17. There is no space for programs for:

(a) Religious services;

(b) Recreation;

(c) Indoor exercise;

(d) Outdoor exercise;

(e) Educational services;

(f) Library, law library and general library services;

18. Disciplinary and grievance procedures lack due process.

*THE HEARINGS OF MAY 5, 6 and 7, 1980*

*Plaintiffs' Witnesses* :

*Arnold E. Pontesso* : Arnold E. Pontesso again testified. He reduced his population cap for the subject jails from 300 to 178 inmates. He told the Court that he did not believe the Consent Decree could be fully implemented in the subject jails without completely gutting it and then rebuilding it, and this was not worthwhile. He testified that to remodel the Central Detention facility was impossible; plumbing work would have to be redone, and air conditioning and electrical installations removed and replaced. He expressed doubt that such gutting and rebuilding could be done floor by floor, one floor at a time, while housing a substantially reduced inmate population on the other floors. Mr. Pontesso doubted that the subject jails can ever meet contemporary correction standards. However, he testified that if Dennis Jones' pretrial service jail population plan [7] is put into effect [8] and the recommendations of Gruzen & Partners [9] are implemented, a substantial reduction in inmate population can be speedily accomplished. Mr. Pontesso further stated that with a substantial reduction in inmate population, many more of the Consent Decree requirements can be met. He testified that the Consent Decree spells out only minimal American Correctional Association standards, but not all Consent Decree requirements are constitutionally mandated. Mr. Pontesso testified that *the subject jails would never be safe* for even a smaller inmate population. He testified that the Sheriff had done a tremendous job so far; that there are serious problems in the subject jails that Sheriff McCarthy simply cannot solve. Mr. Pontesso believes that Paul Bailey is a competent jail administrator, and believes that the new medical and dental plans, although quite expensive, are good.

*Samuel W. Hoover* : Samuel W. Hoover testified to another jail inspection in February 1980. He noted that an inmate with a rash had been placed in the hospital ward and that the air outlet from the hospital isolation ward was recirculated throughout the whole jail, exposing all the inmates. He observed some improvement in the artificial lighting but found the same defects as before in the air conditioning. He observed many unsanitary practices, testifying that the subject jails still posed a definite health hazard, that fire safety had not been improved, and there still existed no recreation. He found continued deficiencies in medical care, and inadequate and inoperable plumbing. Although the food service has been improved, he noted that in general minimum public health standards cannot be met in the subject jails. Mr. Hoover said that he had expected more improvements by 1980 than he found. *In sum, Mr. Hoover found the subject jails unfit for human habitation* and told the Court they could not be made habitable without major renova-

---

7. See Jail Population Management Plan Clark County Jail Overcrowding Study 1980, Exhibit 1 in evidence.

8. This Court has been informally but reliably informed that the 90% federal grant has been received from the LEAA and the local money committed and that the pretrial services program went into effect on August 4, 1980.

9. See Section 2.0 Appendices B and C to the Las Vegas Metropolitan Police Commission Detention Systems Planning and Programming Study, Preliminary Findings Report, Exhibit D in evidence.

tion. Mr. Hoover recommended a maximum population for the subject jails of 160 inmates. The following is quoted from Mr. Hoover's testimony:

"THE COURT: Not only in your inspection of '78, but in your current inspection of February of 1980. You have answered counsel's question that regardless of population, there were those deficiencies. That led me to believe that your point of view was that both jails were not habitable at all and yet you come up with a minimum or a maximum population figure. Is that because you think there has to be some facility for some prisoners regardless of the nature of the health hazard?

"THE WITNESS: Well, my first reaction to the conditions that are there is that they are not habitable, they should not be used. But I don't know where you're going to put the inmates. So, if you have to use something, you have to take the lesser of two evils and in this instance, if you can reduce the population to those—

"THE COURT: It is a lesser of two evils, then?

"THE WITNESS: It is a lesser of two evils."

Mr. Hoover concluded that the American Public Health Association standards cannot be met in the subject jails even with an inmate population of not more than 160 inmates.

*Frederic D. Moyer*: Mr. Moyer, whose affidavit is attached to plaintiffs' motion for preliminary injunction, is also a highly qualified and nationally recognized expert in the field of detention and corrections and, particularly, in the design of same. In his affidavit, Mr. Moyer sets a population capacity of 146 inmates for the subject jails, 122 inmates in Central Detention, 24 inmates in the Annex. Mr. Moyer had visited the jails in 1974 and did so again in 1980. In his May 1980 testimony, he said that in 1974 in the Nevada Correctional Master Plan, in the preparation of which he played a principal role, the Central Detention facility was recommended to be used only as an interim facility for a maximum population

of 120 inmates. Obviously, the recommendation had been ignored. Mr. Moyer saw little or no change in six years in jail conditions. *He believes that the subject jails are unfit for human occupancy.* He testified that the Consent Decree tracks the minimum requirements of the American Correctional Association. He believes that without substantial modifications or additions, the subject jails do not offer inmates housing conditions which meet Consent Decree requirements at any level of occupancy. In his affidavit, Mr. Moyer points out that a substantially reduced population level in the subject jails will allow for a majority of the Consent Decree requirements to be met without the delay necessary for extensive modifications or additions and the outlay of unjustified sums of money. *Mr. Moyer testified that dormitory housing is not safe for inmates other than those who pose a minimal or no security risk to others. Mr. Moyer thinks that reduction in dorm occupancy in an attempt to meet Consent Decree requirements is no long term solution to the present inadequate jail conditions. Substantial population reduction will, he believes, improve health and sanitation but will not significantly alter the present inmate safety and security deficiencies of the dorms. Although in Mr. Moyer's view the subject jails are unfit for human occupancy and should be shut down, he recognizes the absolute necessity for a local Metropolitan Police Department detention and corrections facility. Hence, Mr. Moyer recommends a substantial population reduction, with the implementation of all Consent Decree provisions that can reasonably be expected to be accomplished, as the best way to deal with the problem until a new jail, built to fully conform to Consent Decree and American Corrections Association standards, is available.*

Mr. Moyer has reviewed Exhibit D, the Gruzen & Partners study, and the four options offered to the Metropolitan Police Commission in the study by Paul Silver (discussed more fully infra). *Mr. Moyer approved of Mr. Silver's Option 1, a population of 178 in the subject jails, i. e., 144 inmates in Central Detention and 34 in the Annex, as close to his own population cap.*

*Defendants' Witnesses*

*Paul Silver*: Architect Paul Silver, of Gruzen & Partners, criminal justice consultants, presented the Court with Exhibit D in evidence entitled "Las Vegas Metropolitan Police Commission Detention Systems Planning and Programming Study." (See Footnote 9.) The Metropolitan Police Commission had replaced Cambeiro & Cambeiro and Michael Wong with Gruzen & Partners, and Keith Farris, a Nevada architect. On November 5, 1979, the Metropolitan Police Commission appointed Paul Silver as Consent Decree implementation plan project director. Mr. Silver and his firm are well recognized nationally as experts in the field of designing detention and correction facilities. Several of plaintiffs' witnesses, themselves highly qualified and nationally recognized authorities, commended Paul Silver for his work in preparing Exhibit D. *Mr. Silver's excellent report has provided much education to all those of us concerned with the desperate problems of our local detention and correction facilities. It is obvious to this Court that this sad state of affairs is the product of years and years of the most culpable neglect by the Clark County Commissioners and, since 1977, by the Mayors and City Commissioners of Las Vegas, of the unmet needs of suffering human beings.* Mr. Silver had offered to the Metropolitan Police Commission four options as his best solutions to the problem that this Court inquired about again and again during the series of hearings held in this case and that is, *what do we do between now and the time some three to five years hence when the new jail is ready for occupancy?* The four options proposed by Mr. Silver are set forth and fully discussed in Exhibit D in evidence (see Title 4.0 Interim Use Scenarios).

There is attached hereto marked as Exhibit 1 Mr. Silver's "Summary: Short Term System Capacity."

Following the summary, the report discusses the four options, attached hereto and marked Exhibit 2.

There follows in Exhibit D in evidence, immediately after the above-quoted material, a layout of Option 1.

Following the layout, the report discusses Option 1. This discussion is attached hereto and marked Exhibit 3.

Of the four options, the Metropolitan Police Commission adopted Option 4 which Mr. Silver had recommended as the best interim solution, that is, a population cap of 381 inmates, 292 in Central Detention and 89 in the Annex.

There then follow in Exhibit D in evidence layouts and descriptions of Options 2, 3 and 4, marked D–11, D–12 and D–13, respectively.

Along with plaintiffs' expert witnesses, Paul Silver testified that if the inmate population is drastically reduced, and if costs and time are not considered, the Consent Decree can be fully implemented in the subject jails but, in order to do so, it would be necessary to gut the existing facilities and rebuild them, which could take about one year. Mr. Silver forecast the new jail would be completed at the end of 1982. Mr. Silver testified that in order to obtain optimum living and day room space under Option 4, it is necessary to eliminate all of the program space on the second floor, except for medical space; to eliminate all program space on the fourth floor; to eliminate all dining rooms and to feed all inmates in the six–foot wide halls. He testified that although Option 1 provides for all single cells on the fourth floor, and although he agreed that a sufficient number of single cells are essential for inmate safety, and although he conceded that Option 4 does eliminate the single cells and replace them with multiple occupancy, yet he still preferred Option 4.

*Larry Lee Ketzenberger*: This witness testified in May of 1980, having filed previously an affidavit as an exhibit to the defendants' memorandum in opposition to the plaintiffs' motions for a preliminary injunction and a special master. Mr. Ketzenberger is the Assistant Sheriff for staff operations in charge of Metro jails. In his affidavit, he detailed 36 major improvements that had been made in implementing the Consent Decree. He testified in January

1980 that the Annex had become a receiving center for inmates to be held no longer than 48 hours. He testified that in January 1980 ARA Caterers, a nationally recognized food service company, had begun food service to the inmates in the subject jails; that laundry service would be done outside the jails by Mission Linen Company of Las Vegas, and that underwear and sox, etc., would be furnished inmates, in addition to all of their outer garments and other wearing apparel. Mr. Ketzenberger testified that since March of 1980 a full range of physical and mental health medical services and some dental services were being provided to the inmates by Prison Health Services, a Delaware corporation; that the Clark County Medical Association and the Nevada State Medical Association were involved in supervision of the medical services to be rendered, and that medical services had been reviewed and approved by Dr. Della Penna; that the Justice Court of Las Vegas Township may use the successful television arraignment procedure now in effect in Las Vegas Municipal Court. He testified that to increase fire safety, an expensive new locking system was installed. He recommended that the second floor parking lot of the Clark County Courthouse be converted to a yard for inmate outdoor recreation; that more space for jail programs in Central Detention was being made available by moving out non-jail activities. Mr. Ketzenberger advised the Court that the position of jail maintenance director had been upgraded and hoped that sanitation would improve.

*Paul Edward Bailey*: Mr. Bailey, a skilled and experienced jail administrator, has for some time past been in charge of the subject jails. Without saying more, it is sufficient to say that it is now clear to this Court that Mr. Bailey has quickly taken charge and instituted many changes to improve the lot of the inmates. He has been resourceful, industrious and effective in changing and altering conditions that can be changed. In this Court's opinion, Sheriff McCarthy and the Metropolitan Police Commission have made a wise choice in selecting Mr. Bailey.

*Sheriff John D. McCarthy*: The Sheriff testified in May 1980. He told the Court that at first he believed that the Consent Decree could be implemented in the existing facilities pending the availability of a new jail, *but that he now believes it impossible to fully implement the Consent Decree in the subject jails, and this is his opinion regardless of the population limitation.* Sheriff McCarthy approves Dennis Jones' Exhibit 1 and does not find fault with its findings or conclusions and favors the prompt implementation of the pretrial release program.

## DISCUSSION

Despite much improvement in the subject jails since this litigation was commenced, and particularly since Sheriff McCarthy took office in January of 1979, if there were available in Southern Nevada any other Metropolitan Police Department detention and correction facility, this Court would close down the subject jails, ordering the defendants to house no inmates in them until the subject jails can be gutted and rebuilt to meet minimum constitutional standards. This is so because today the subject jails are still unfit for human habitation and it is doubtful that they can be made fit without gutting and rebuilding. There being no other jail facilities available, this Court must walk a tight rope in order to maintain a delicate balance between public safety and the conditions of confinement of inmates that approach constitutional minima, that is, that they are as humane as possible under the circumstances.

## INMATE POPULATION LIMITATION OF 178

■ Defendants have recommended a phased inmate population reduction to 400, i. e., Central Detention 300, Annex 100.

Defendants' expert Thomas F. Lonergan has recommended a population cap of 374 inmates, i. e., Central Detention 300, Annex 74.

Defendants' expert Paul Silver has recommended a population cap of 381 inmates (Exhibit D's (in evidence) Option 4), i. e., Central Detention 292, Annex 89.

Arnold E. Pontesso, plaintiffs' expert, first recommended a cap of 300 inmates but changed his opinion to a population cap of 178 (Exhibit D's (in evidence) Option 1), i. e., Central Detention 144, Annex 34.

Plaintiffs' expert Frederic D. Moyer has recommended a population cap of 146 inmates, i. e., Central Detention 122, Annex 24 (Mr. Moyer does not quarrel, however, with Exhibit D's (in evidence) Option 1 having a population cap of 178 inmates, i. e., Central Detention 144, Annex 34).

Plaintiffs' expert F. Warren Benton recommends a population cap of 150 inmates.

As indicated at the beginning of this order, this Court has established a population cap of *178* inmates, Central Detention *144*, Annex *34*. *This Court adopts Paul Silver's Option 1 and orders the defendants to implement Option 1 without delay.* This Court rejects Paul Silver's Options 2, 3 and 4, as well as all other alternatives that have been suggested.

It is this Court's objective that between now and the time a new jail is ready for inmate occupancy, some three to five years from this date, to house in these unconstitutional jails as few inmates as reasonably consistent with the public safety. *The public safety must, of course, always come first.* The lives and safety of the inmates, although of great importance, are secondary to the public safety.

In establishing by this order an inmate population limitation and in enforcing its order, if not obeyed, this Court acts constitutionally: [10]

1. To vindicate the constitutional rights of unconvicted inmates to due process of law under the Fourteenth Amendment to the Constitution of the United States, which this Court finds they are being denied in the subject jails;

2. As to convicted inmates, to enforce the Eighth Amendment prohibition against cruel and unusual punishment, made applicable to the states under the Fourteenth Amendment to the Constitution of the United States. This Court finds that confinement in the subject jails constitutes cruel and unusual punishment as to convicted inmates housed therein.

*THIS COURT'S JAIL POPULATION LIMITATION POSES NO DANGER TO PUBLIC SAFETY*

There should be no fear that this Court's order will release dangerous criminals to prey upon the public. This false impression pandering to public fear has been created by statements by one County Commissioner and perhaps by statements of other defendants. It is ironic that such statements are made by those very persons whose dereliction of duty have allowed the jail conditions to degenerate over the years.

Under this Court's population cap, there is not only ample capacity to house all those that should be incarcerated to insure the public safety, that is, those persons charged with violent crimes and those likely to flee if released before trial or hearing, but additional capacity to allow the logical separation of inmates within the subject jails.

For many years past, as well as today, an unnecessary and unreasonably high number of persons have been and are incarcerated in the subject jails. The average population in the subject jails between May 1, 1979, and October 30, 1979, is 524 inmates (see Exhibit 1 in evidence). For comparison, the Allegheny County Jail, which includes the Pittsburgh metropolitan area of two and one quarter million people, has a current jail population of 425 inmates. Travis County, Texas, which includes the Austin metropolitan area – approximately the size of Las Vegas, has 200 inmates.

Dennis Jones' Exhibit 1 in evidence reflects that between May 1, 1979, and October 30, 1979, of the average inmate population of 564, 79% were unconvicted persons and 21% were convicted persons. For ready reference, there is attached hereto as Exhibit 4 the "Executive Summary of Find-

---

10. See *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447; *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522, *Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977); *Spain v. Procunier*, 600 F.2d 189 (9th Cir. 1979).

ings," pages 6, 7, 8 and 9, of Dennis Jones' report, Exhibit 1 in evidence.

### SIX MONTHS TO REACH POPULATION CAP

This Court will allow the defendants 180 days from the date of the filing of this order within which to reach an average daily population in the two subject jails of not more than 178 inmates. It is ordered that the Annex continue to be used as it is presently as a 48–hour holding facility only.

While this Court at this time will not direct the defendants as to those categories of inmates that may be housed in the subject jails, it does, of course, expect that the defendants will house only those inmates whose incarceration is required in the interest of public safety.

This Court urges that the splendid work of Dennis Jones and others who have worked with him in creating the pretrial release program now just getting under way, be fully supported not only by the defendants, but by all other public officials in the criminal system whose work impacts upon the subject jails.

All defendants and those other public officials in the criminal justice system mentioned are also urged to put into effect as promptly as possible the excellent suggestions of Dennis Jones and Paul Silver which are found in Exhibit D in evidence, "2.0 Population Analysis & Projections," Appendices B and C.

### STATUS REPORTS ON POPULATION REDUCTION

Defendants shall file with this Court and serve on plaintiffs' counsel monthly status reports setting out in detail steps that have been taken, are being taken, and are proposed to be taken to reduce inmate population to meet the population cap imposed by this Court. Defendants shall also provide in the monthly reports the actual inmate count day by day throughout the month and the average number of inmates during the month.

The defendants are warned, however, that if the population reduction does not proceed with "*all deliberate speed,*" this Court will not hesitate at any time to provide by subsequent order the specific manner in which the population cap shall be reached and maintained and appoint a special master at the defendants' expense to enforce this Court's order in that regard.

### POSSIBLE CONFLICTS BETWEEN STATE LAW AND FEDERAL LAW

█ During oral arguments on May 7, 1980, there was a discussion regarding the possibility of the Sheriff and the other defendants being ordered by this Court to achieve and maintain a population cap in the subject jails on the one hand and, on the other hand, being ordered by the state court judges to take prisoners into custody and house them in the subject jails that might exceed this Court's population cap. This Court is confident that this order will have the full support of all state judges and that the possibility posed will not become a reality. However, *this Court's order will prevail* in any such eventuality.[11] Although the state judges are not parties to this action, they will be bound to observe this Court's order limiting inmate population because of the supremacy clause of the Constitution of the United States.

Article VI, Clause 2, of the Constitution of the United States reads in pertinent part:

> "This Constitution, and the laws of the United States which shall be made in pursuance thereof; . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

11. See *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823; *Oklahoma v. Guy F. Atkinson Co.*, 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487; *Campbell v. McGruder*, 580 F.2d 521, 526 (D.C.Cir.1978); *In re Grand Jury Subpoena*, 596 F.2d 630 (4th Cir. 1979).

This Court's order limiting population is of constitutional dimensions; it vindicates and enforces the inmate rights under the Constitution of the United States and will prevail, any constitutional provision, statute, ordinance, regulation, or judicial order of any court of the State of Nevada, or of any inferior court thereof, or of any ordinance, regulation, or order of any administrative body of any political subdivision of the State of Nevada, to the contrary notwithstanding.

## CONSENT DECREE COMPLIANCE

Although in earlier hearings counsel and this Court spoke of there being differences between the Consent Decree requirements and constitutional minima established by the Supreme Court and other courts, there would be no purpose served here for this Court to attempt the very difficult job of defining which of the 239 subsections of the Consent Decree are constitutionally mandated and which are not. These distinctions are not important because the Consent Decree, signed by all the defendants, is a contract between the parties to this litigation, approved and adopted by this Court. This Court means to enforce the Consent Decree by *exercising its contempt powers if necessary*, except only to the extent that this Court does not believe that it is just and equitable to compel full Consent Decree compliance in the subject jails. To achieve full Consent Decree compliance in the subject jails would cost an unreasonable amount of money. Such full compliance would take too long to accomplish and would, of course, require that the subject jails be gutted and rebuilt. Besides, during any such period of gutting and rebuilding, the disruption would make the lot of the inmates even worse and would require a population cap much lower than that fixed by this order and, in addition, would render it well nigh impossible for the jail administrator and his correction officers to function. However, the burden of proof is now clearly placed upon the defendants to satisfy this Court subsection by subsection why it would be unreasonable for this Court to demand full compliance with the Consent Decree.

The defendants are warned that Title III, section 7, of the Consent Decree reads:

"It is fully understood and agreed by and between the parties to this Consent Decree that economic considerations shall not be deemed to be an excuse or a justification for the failure of any party hereto to comply with any provision of this Consent Decree."

## NINE MONTHS FOR SUBSTANTIALLY FULL COMPLIANCE WITH THE CONSENT DECREE

The defendants are allowed nine months from the date of the filing of this order to implement the Consent Decree in the subject jails to the fullest extent that can reasonably be done. Every three months the defendants shall furnish this Court and serve on plaintiffs' counsel status reports on Consent Decree implementation. These status reports will supplement the "Consent Decree Implementation Schedule Revised 11/1/79" and deal only with those Consent Decree provisions subsection by subsection that have not been reported implemented as of November 1, 1979. The report will first list each such provision that has been implemented since November 1, 1979. Next, the report will list each such provision that has not been implemented as of the date of the status report and state when each such provision will be implemented. As to the provisions that the defendants sincerely believe cannot reasonably be implemented in the subject jails under the standards laid down by this Court in this order, defendants must fully explain and justify.

## COMMENDATIONS AND ADMONITIONS

Sheriff McCarthy, his jail administrator and assistants deserve high praise for the progress they have made in the Consent Decree implementation, and this Court is confident that, with the funds that the Metropolitan Police Commission *must* make available on an emergency basis, the Sheriff and his said staff will continue to do all

**1008**

that is reasonable to meet the Consent Decree requirements. This Court suspects that if there is to be any foot–dragging, it will not be on the part of the Sheriff or his staff but, rather, on the part of one or more of the other defendants in this case. A word to the wise is sufficient.

Exhibit 1

## Summary:
## Short Term System Capacity

| | Strict definition of Consent Decree space standards (ACA) | | | |
|---|---|---|---|---|
| CONSENT DECREE COMPLIANCE | Compliant but inefficient in all options. Annex is for 48 hour holding only. | Compliant but inefficient. Compliant in space standards only. | Consent decree Compliant in space standards. Some classification problems. | Constitutional, but not Consent Decree compliant for space standards. Some classification problems. |
| UPGRADING REQUIRED | No layout change— minor upgrading. | Slight layout change— minor upgrade. | Moderate layout change. | Moderate layout change. |
| HOUSING | No physical change. 4th floor all single rooms. | Increase multiple occupancy by borrowing existing support space. Existing rooms & dorms unchanged. | Increase multiple occupancy by borrowing existing support space. Existing single rooms modified. | Increase multiple occupancy by borrowing support space and tighter standards. |
| SUPPORT & PROGRAM | Reduced population allows reprogramming of existing space. Some space used in Court wing. | Somewhat increased population. Use all space in Court wing for program & support. | Needed space slightly exceeds available in terms of Consent Decree. | Needed space considerable—exceeds available in terms of Consent Decree. |
| CENTRAL | 144 | 216 | 233 | 292 |
| ANNEX | 34 | 89 | 89 | 89 |
| | | | | |
| TOTAL | 178 | 305 | 322 | 381 |
| | OPTION 1 | OPTION 2 | OPTION 3 | OPTION 4 |

KEITH EDWARD FARRIS          GRUZEN & PARTNERS          L.V.M.P.D.
Architect                              · Criminal Justice Consultants     Planning & Programming Study

---

## Exhibit 2
## INTERIM SOLUTION ASSUMPTIONS

In developing the following four interim facility capacity options, Gruzen & Partners has considered a number of different factors or assumptions. The requirements of the Federal Court Consent Decree serves as the basis for all four options.

Capacity under each option increases from a low of 178 under Option 1 to a high of 381 under Option 4. However, as the population increases, flexibility for classification or separation of distinct types of inmates is compromised. In addition, the higher capacities (3, 4) actually result in a deficit of available space for program functions.

Support space, under all four options, remains constant as no changes in staffing levels are expected under the decreased population levels. This is due to the fact that while minimum acceptable space standards for residential, program and support functions are provided under each option, compromised classification added to inherent design constraints will result in effective security being dependent upon comfortable staffing complements.

In all cases, the City Hall Jail Annex is contemplated as a short–term holding facility. As it is clear that inmates would spend a maximum of 48 hours here, an absolute minimum of program space is required. Potential capacity for the annex ranges from 34 inmates in Option 1 to 89 in Options 2, 3, and 4, with the variation due to conversions of an auditorium and unused cafeteria into additional single cells. In Option 1, the Jail Annex meets Consent Decree space standards in all areas except recreation and program areas. Again, if utilized as a 48 hour facility for inmates prior to either securing release or being transferred to the County Jail, the absence of program/recreation space should not, on an interim basis, be overly problematic.

## Option 1

Option 1 represents a potential bed capacity of 202 including:
- 144 beds in Central Jail
- 34 beds in City Hall Annex

All Consent Decree requirements are provided for under this option with the one exception being the aforementioned lack of recreation in the 48 hour holding facility. This option, however, does not provide a sufficient number of beds to meet inmate population, given even maximum reductions described in the population section.

## Option 2

Option 2 provides a total bed capacity of 308 including:
- 219 beds in Central Jail
- 89 beds in City Hall Annex

The primary difference in this option is due to the increased levels of multiple occupancy cells achieved by borrowing existing program and support space. Compliance with Consent Decree space standards is achieved, however, flexibility and efficiency of operations are sacrificed.

## Option 3

Option 3 provides a slightly higher number of beds with 325 being the resulting count. They are divided into:
- 236 beds in Central Jail
- 89 beds in City Hall Annex

Slight deficits in required program and support functions result, due to the higher inmate population and relative needs. Once again, multiple occupancy living situations are increased, resulting in further strains on classification flexibility and security.

## Option 4

Option 4 provides a total bed capacity of 381 including:
- 292 beds in Central Jail
- 89 beds in City Hall Annex

While this Option does not meet the Consent Decree space standards in certain areas, it is, however, consistent with court decisions in other jurisdictions. A larger deficit of program and support space results under this option, and classification flexibility is strained due to the predominance of multiple occupancy cells and dormitories in both the Main Jail and the City Hall Annex.

---

KEITH EDWARD FARRIS
Architect

GRUZEN & PARTNERS
Criminal Justice Consultants

L.V.M.P.D.
Planning & Programming Study

Exhibit 3

OPTION 1: CAPACITY 144: CONSENT DECREE COMPLIANCE

Standards: Single Rooms: (45% of Beds)
    60 SF/Room
    35 SF/Dayspace
Multiple Occupancy (2 to 16 Beds)
    60 SF/Bed
    35 SF/Dayspace
    10 SF/Circulation
Dormitory
    75 SF/Bed
    35 SF/Dayspace
    10 SF/Circulation
Dining
    9–12 SF/Person
Program
    25 SF/Person (+ large outdoor area on adjacent parking deck)
Visiting Per Consent Decree:
    8 Persons/Hr $= \dfrac{(144 \text{ Person}) (4 \text{ Visits/Wk}) (\frac{1}{2} \text{ Hr Visit})}{(40 \text{ Hrs/Wk Avail.})} =$

    360 SF

Characteristics:

Reuse of existing cells and dormitories possible at reduced capacity with minor upgrading.

Some support/staff areas, as noted, are relocated on 3rd floor courts wing.

Upgraded program areas are installed in areas vacated as result of reduced population.

A surplus is available for other users in renovated 3rd floor court wing.

High ratio of single rooms assures good classification potential.

Staff + Support:

Staff and support spaces indicated in renovated 3rd floor court wing (15,400 SF) include:

| | | |
|---|---|---|
| Executive Administration | = | 2,600 SF |
| Custody Administration | = | 3,700 SF |
| Business & Clerical | = | 2,800 SF |
| Lobby | = | 300 SF |

These areas are fixed in all 4 models to provide for full staff now in operation or authorized. The staff would be retained for use in new facility when completed. Therefore, a fixed area is left for programs and visiting of 6000 square feet.

Life Safety:

Addition of new outside stairs, use of outdoor rec. area as refuge, and compartmentalization will suffice.

KEITH EDWARD FARRIS
Architect

GRUZEN & PARTNERS
Criminal Justice Consultants

L.V.M.P.D.
Planning & Programming Study

Exhibit 4

EXECUTIVE SUMMARY OF FINDINGS

1. The average daily population over the past six months, 5/1/79–10/30/79, in the Clark County Detention Facilities has been 524 inmates.

2. Of that total:
    71% are felony pretrial status

    10% are felony sentenced status

    8% are misdemeanor pretrial status

    9% are misdemeanor sentenced status

    2% are gross misdemeanor sentenced status

3. 62% of all arrests are for misdemeanor charges;
    37% of all arrests are for felony and gross misdemeanor charges.

4. 53% of all persons arrested on misdemeanor charges are released within 24 hours;

   35% of all persons arrested on felony and gross misdemeanor charges are released within 24 hours.

5. 78.8% of all persons arrested are Clark County residents.

6. The most frequently used method of release is the bail bond—41.7% of all releases.

7. 70.8% of all arrests have Las Vegas Justice Court jurisdiction;

   28.1% of all arrests have Las Vegas Municipal Court jurisdiction.

8. 33.6% of all persons arrested have never been arrested before;

   52.2% of all persons arrested have never been convicted of any crime.

9. Of all persons arrested, 23.3% have their charges denied by the prosecuting attorney, 12.7% have their charges dismissed, 9.7% have no charges filed by the Police Department, and 10.6% are released credit for time served.

10. The current annual cost of housing one inmate in the existing Detention Facilities is $9,631. ($26.37 per day)

    If the proposed budget augmentation to implement specific provisions of the Consent Decree is approved, the annual cost will be $13,587. ($37.20 per day)

11. The Metropolitan Police Department's Jail Management Information System, as well as their general Records, are incomplete and inaccurate.

12. Booking women into custody on prostitution charges has created a "revolving door administrative punishment" practice in which women are arrested, bail out within 5 hours, and have their charges dismissed. The only benefit of this practice is to the private bail bonding companies.

### EXECUTIVE SUMMARY OF RECOMMENDATIONS

1. Clark County must initiate a felony based pretrial release program. This program should be administered by the Eighth Judicial District Court. It should include conditional and supervised release options to limit the number of pretrial defendants held in custody to those persons who are adjudged to present a danger to the community or to pose a strong risk of flight from the jurisdiction.

2. The Sheriff must amend existing departmental orders governing misdemeanor citation in lieu of arrest. The general order must specify a presumption of release, unless one of several exclusionary elements are present. It must also provide for a review process whereby misdemeanor arrests are viewed the same day by a supervising officer, to ensure that the guidelines are followed.

3. Probable Cause Hearings must be conducted for all persons detained within 24 hours of arrest. At this hearing Judges should:

   A. Determine whether the arrest was based upon probable cause, using the affidavit of arrest provided by the arresting officer.

   B. Appoint the Public Defender to represent indigent defendants, based upon the "Affidavit of Financial Conditions" completed by the Court Intake Officer.

   C. Set bail or authorize release on recognizance (Personal, supervised or conditional) based upon the qualification submitted by Pretrial Services. A presumption in favor of release should apply in all cases where defendants are shown not to present a danger to the community and not to be a strong risk of flight.

4. If additional video equipment is required to enable Justices Of the Peace to comply with recommendation # 3, such equipment should be provided by the County.

5. N.R.S. 178.484, which allows the watch commander in the Detention Facilities to release qualifying misdeamants should be broadened to allow for more releases. The statute is too restrictive.

6. The City of Las Vegas and Clark County should co–sponsor a grant application to LEAA, which, if awarded, would initiate a community service restitution program. Applicants should be Lower Court Counselling and the Voluntary Action Center.

7. The Justice and District Court must continue to monitor and improve criminal case processing to insure that delay and backlog do not contribute further to jail overcrowding, failure to appear, and rearrests. In–custody defendants must be given scheduling priority at each step of the adjudicatory process.

8. Sentenced Felons awaiting transportation to the Nevada State Prison or awaiting further Court proceedings should not remain in custody longer than 48 hours, once a judgment of conviction has been signed by a District Court Judge.

9. Parole violators should not be housed in Clark County Detention Facilities longer than 24 hours.

10. Defendants booked for probation violation must be promptly scheduled for a revocation hearing. The four to six week standard currently in use is unacceptable and should be shortened.

11. The Sheriff's Detention Facilities Advisory Committee should continue to operate in its present capacity, with support from all criminal justice agencies within Clark County. A sub–committee should be formed to act as an advisory board to pretrial services.

12. The Sheriff, through the Director Of Detention, should develop a jail management information system, preferably automated, to generate information and statistics about the jail population.

Recommendations 1–5 reflect upon criminal justice practices which occur at the critical pretrial stage. They will be discussed in detail in section III. Recommendation 6–12 stem from analysis of the jail population and criminal justice practices and procedure. Detailed analysis of these rec-ommendations did not fall within the scope of this project.

Alternative Recommendation: An alternative to the pretrial release program described herein could be the adoption of a Bail Commissioner system. In such a system, the Court operates a 10% cash bail program, and Judges or Commissioners set bail or authorize pretrial release for all persons arrested, shortly after the booking process is completed. Such a system would have to be run 24 hours per day, seven days per week. The commissioners or Judges would also appoint indigent counsel in appropriate cases. Lane County, Oregon operates such a system. The state of Connecticut uses a similar practice.

Further alternatives programs which should be studied include:

1. Initiation of a work release program.

2. Use of alternative minimum security housing of inmates.

3. Expansion of weekend court and night court.

4. Further reduction of case processing delay for in custody defendants.

5. Use of an alcohol detox center which has custody authority.

PROPOSED REDUCTION STRATEGIES—BY PRISONER CATEGORY AND POTENTIAL FOR REDUCTION

(Circle represents entire jail population— sections are classifications)

(a) Felony Pretrial—Pretrial Release is the only remedy which can reduce this target population. The projected range of reduction,

should a program be funded: 10–40% of this category.

(b) Gross Misdemeanor Sentenced & (e) Felony Sentenced—Immediate discharge once a Judgement of Conviction has been signed & housing inmates at Jean who are awaiting further proceedings will reduce this population. No more than 24 inmates or 3% of the ADP on a given day should fall into this category. Therefore a 9% reduction of the current average daily population should be realized.

(c) Misdemeanor Pretrial—Expanded use of misdemeanor citation: Range of potential reduction depends upon what type of policy is used and how it is enforced. The maximum benefit would be a 78% reduction. (All non-warrant arrests cited) Expanded use of misdemeanor stationhouse release would have less than a 1% effect upon the population if a presumptive citation policy were used.

(d) Misd. Sentenced—The Alternative Sentencing Committee projects an expected reduction range of 30–40% of this category.