Donald J. LAREAU

v.

John R. MANSON, Commissioner of Correction, State of Connecticut.

Jesus CAMPOS, James Scott, Jr., Donald J. Lareau and Clarence King

v.

John R. MANSON, Commissioner of Correction, State of Connecticut, and Richard Wezowicz, Warden, Hartford Community Correctional Center.

Civ. A. Nos. H 78–145, H 78–199.

United States District Court, D. Connecticut.

Dec. 29, 1980.

Martha Stone, Connecticut Civil Liberties Union Foundation, James W. Greene, Jr., Jon C. Blue, Prisoners' Legal Assistance Ass'n, Hartford, Conn., for plaintiffs.

Stephen J. O'Neill, Lee Bezanson, Asst. Attys. Gen., Carl R. Ajello, Atty. Gen. of the State of Conn., Hartford, Conn., for defendants.

Renee D. Chotiner, New Haven, Conn., for amici curiae Jerome N. Frank Legal Services Organization, Yale Law School, et al.

## MEMORANDUM OF DECISION

JOSÉ A. CABRANES, District Judge:

The plaintiffs in these consolidated actions are the class of inmates at the Hartford Community Correctional Center ("HCCC"), including both persons being detained pending trials on criminal charges and convicted inmates serving sentences of imprisonment.[1] They challenge a number of the conditions of their confinement—principally, the overcrowding of the HCCC, but also other conditions, including allegedly inadequate health care, sanitation, food and heating—on constitutional grounds. The defendants are John R. Manson, Commissioner of Correction of the State of Connecticut and Richard Wezowicz, Warden of the HCCC. The case was tried before Magistrate F. Owen Eagan, who rendered proposed findings of fact and conclusions of law. The court filed its findings of fact, pursuant to Rule 52(a), Fed.R.Civ.P., after considering the magistrate's proposed findings, the parties' submissions and the record as a whole.[2] On the basis of the facts as found, the court renders its conclusions of law and its ruling on an appropriate remedy in this Memorandum of Decision.

Stated briefly, the court holds that conditions at the HCCC—where well over 500 inmates are housed in an institution designed to accommodate only 390, so that more than 100 inmates live doubled up in 60 or 65 square-foot cells, or crowded in a small makeshift dormitory, or in a hospital area—cause serious harm to the health and well-being of the inmates and the security of the institution. The court also holds that defendants have not justified the policies which allowed such conditions to come about, and that the overcrowded conditions: (a) constitute impermissible "punishment" of those inmates who have not been convicted of any crime, but are merely being held at the HCCC while awaiting trial, in violation of their rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and (b) subject those inmates who are serving prison sentences to "cruel and unusual punishment" forbidden by the Eighth Amendment to the United States Constitution. Furthermore, the court concludes that the defendants' failure to screen inmates for communicable diseases when they are first taken to the HCCC poses so substantial a threat to the health of all inmates (who may therefore be exposed to potential carriers of contagious diseases), without any justification, that it violates the inmates' due process rights.

In the absence of clearly unconstitutional conditions, the judiciary should not, of course, become involved in the operations of correctional institutions. The day-to-day administration of such institutions is a matter for professional administrators, not judges. However, under well-established principles of federal law, a court faced with evidence of violations of the constitutional rights of inmates, such as those established here, may—and, indeed, must—act to remedy them. The court accordingly orders that the defendants reduce the population of the HCCC to its original design capacity of 390 inmates within 45 days of this decision; that they not permit the population of the institution to exceed that number; and that they adopt procedures to screen inmates for contagious diseases upon their arrival at the HCCC. This order is as unintrusive as possible, while remedying the violations of the Constitution which the plaintiffs have proven. The court declines the plaintiffs' invitation to rule that a variety of other condi-

1. The cases were consolidated by order of Magistrate F. Owen Eagan, filed June 5, 1978. On April 2, 1980, Magistrate Eagan recommended that the plaintiffs' motion for class certification be granted, except as to certain claims pertaining to the treatment of non-English-speaking inmates. The court adopted this recommendation—to which the defendants interposed no objection—as its ruling on June 4, 1980.

2. See Findings of Fact, filed November 25, 1980.

tions at the HCCC, which are in large part the results of the overcrowding of that institution, are in themselves unconstitutional. The court also declines the defendants' invitation to devise a comprehensive plan to enable the Commissioner to comply with the court's order. The court thereby follows the instructions of the Supreme Court that federal courts avoid becoming enmeshed in the details or minutiae of administering correctional institutions.

This decision should not be construed as reflecting a willingness to involve the court in the state's correctional practices or policies; to the contrary, it represents a reluctant response to clear proof that the defendants have violated certain basic constitutional rights of HCCC inmates, and an effort to remedy those conditions by ordering speedy and direct relief from them without miring the judiciary in the day-to-day operations of the HCCC. Nor should it be construed as requiring, or in any way sanctioning, the release into the community of inmates now housed at the HCCC. The court expects that the defendants—who have time and again reminded the court of their good faith and asked it to defer to their expertise in administering the state's correctional system—will comply with the court's simple remedial order without in any way jeopardizing the safety of the citizens of this state.

### Summary of Facts

The court's findings of fact were filed on November 25, 1980, and an order clarifying and modifying two of the court's 116 numbered findings was filed on December 19, 1980. There is no need for a detailed recounting of the court's findings of fact. However, the following summary is helpful to an understanding of the court's resolution of the legal issues presented.

The HCCC was designed to hold 390 inmates—one in each cell. However, soon after it opened in July 1977, the HCCC's population swelled. Since January 7, 1980, the institution has had no fewer than 500 inmates on any night; the number of inmates incarcerated there—which fluctuates from day to day—was expected to reach the range of 580 to 630 by December 1980.

Approximately three-quarters of the HCCC's population are pretrial detainees— i. e., inmates who have not yet been tried. The remainder are sentenced prisoners (serving relatively short terms imposed by federal or state courts), persons being held in connection with immigration proceedings and persons awaiting transfers to other institutions. Approximately two-thirds of the inmates incarcerated at the HCCC at any given time have spent more than 60 days there.

Most of the inmates at the HCCC are young; their average age is only 25 years. Among the pretrial detainees are 94 inmates being held in lieu of bonds of $1000 or less.

In an effort to accommodate the increasing number of inmates assigned to the HCCC, the defendants have converted 120 cells which were designed for one inmate into "double-bunked" cells. Equipped with a double-bunk bed, in addition to a toilet and sink fixture, a metal desk and a chair, each of these cells measures between 60 and 65 square feet. A 60 square foot cell has only 36 square feet of "free" space (the equivalent of a 6-foot by 6-foot area) in which the inmates can move; the fixtures and furniture occupy the remaining 24 square feet. The mobility of the inmates in "double-bunked" cells is therefore greatly constrained. On occasion, the defendants have assigned two inmates to one cell in which there is no double bunk-bed; in such a cell, one inmate must sleep on a mattress on the floor, placed between the desk (at one end of the cell) and the toilet (at the other). Inmates so confined have no room at all to move about their cell.

In addition to housing two inmates in cells designed for one, the defendants have converted a "dayroom" of approximately 200 square feet (the equivalent of a 10-foot by 20-foot area), which was originally designed and used for eating and recreation, into a dormitory. This "dayroom," dubbed the "fishtank" by the inmates (because its walls are transparent, so that the inmates

are readily observed at all times from a corridor), houses as many as nine persons.[3] Inmates in the "fishtank" actually crawl over one another to reach the single toilet provided to them. Finally, the defendants' search for space to house the increasing number of inmates has led them to place inmates suffering from no illness in cells in the HCCC's hospital area. At times, inmates who are well are required to share a "double-bunked" cell with inmates who have physical or psychiatric disorders. Inmates housed in the hospital unit are routinely confined to their cells for 23 hours every day; they have no access to "dayrooms" or other recreational facilities.

The overcrowding at the HCCC is manifested not only in its housing conditions, but in other aspects of life at the institution. Particularly noteworthy is the overcrowding of the "dayrooms." With the exception of approximately 20 sentenced prisoners who leave the HCCC to participate in "work release" or "educational release" programs in the community, the inmates spend almost all of their time either in their cells (or the "fishtank," if they have been assigned to that makeshift dormitory) or in the "dayrooms." Except for the "fishtank," which has been converted into a residential area, the "dayrooms" (which measure between 196 and 262 square feet) are used for inactive recreation—such as playing cards, watching television and reading—and as dining areas. There are regularly 15 to 20 inmates (and occasionally as many as 24) in the "dayrooms"; while eating meals, inmates have had to sit on the floor, a radiator or even the single toilet in the "dayroom." The crowding of the "dayrooms" increases the level of tensions, and the incidence of fighting, among inmates at the HCCC. More generally, the overcrowded conditions at the HCCC have had an ad-

verse psychological impact—above and beyond that which is inevitably caused by incarceration—on the inmates, particularly the young inmates who make up much of the facility's population. As a result of the overcrowded conditions at the HCCC, some inmates choose to plead guilty to pending charges (and thus reduce the time they would have to spend at the HCCC) rather than wait, at the HCCC, for their cases to be tried.

The level of services provided to inmates at the HCCC has deteriorated as the population has increased. For example, each of the four counselors at the facility—assigned to conduct "intake" interviews with newly arrived inmates, to act as liaisons between inmates and agencies outside the institution, and to assist inmates with their personal problems—now has a caseload of approximately 130 inmates. It is hardly surprising that the counselors are unable to respond to all of the requests (approximately 40 to 60 per counselor daily) for help which the inmates make. The psychiatrist who visits the HCCC weekly sees 152 inmates per month, but cannot see many more inmates who desire his assistance. Those inmates fortunate enough to obtain appointments with the psychiatrist see him for an average of only 7 to 8 minutes. Finally, the increased population of the HCCC has caused an increase in the number of visitors who come to see the inmates. The defendants have responded to this development by curtailing the period of visitation for inmates to 45 minutes per inmate per day.

The overcrowded conditions have strained the provision of medical care to inmates at the HCCC. Moreover, the inmates' health is adversely affected by another practice, apparently unrelated to the overcrowding

---

3. After the record in this case was closed, the defendants allegedly made certain modifications of conditions in the "fishtank." According to representations made by the defendants' counsel in the course of oral argument, and in an earlier document filed with the court, the "fishtank"—which is still separated from a corridor by a transparent wall, and still contains only one open toilet for its numerous resi-

dents—now is populated by eight, rather than nine, inmates; the inmates now sleep in four double-bunk beds, rather than individual beds arranged on the floor of the "fishtank." See Transcript of Oral Argument on Appropriate Conclusions of Law and Remedy, Dec. 8, 1980 ("Tr.") 37–42; Defendant's Proposed Plan for the Hartford Correctional Center, filed November 21, 1980.

of the institution: the defendants do not test or screen newly arrived inmates for infectious or contagious diseases. Because potential carriers of communicable diseases are not identified or isolated from the general population of the HCCC, other inmates may be exposed to the carriers. The defendants' practice of double-bunking inmates and crowding them into the "fishtank" aggravates the dangers posed by such inadequate screening procedures; inmates who share close quarters with others who may have an infectious disease are more likely to contract such a disease than those who occupy single cells.

Finally, overcrowding has jeopardized security at the HCCC. Tensions and fights among inmates have increased; correctional officers, each of whom is responsible for 48 to 60 inmates, have found it more difficult to police the institution. For example, there are often so many inmates in the "dayrooms"—which are supervised by the officers at all times except when they are on their hourly checks of the cells—that the inmates block the officers' view of what is going on inside the room.

In the absence of an order of this court, the overcrowding of the HCCC is not likely to be diminished in the near future. The inmate population continues to increase, and is expected to do so until the correctional institution at Cheshire, Connecticut, is opened; that facility is scheduled to commence operations in November 1981. However, the defendants have made contingency plans to house inmates who cannot be housed at the HCCC and other comparable facilities. These plans include opening a 250-bed facility at Camp Hartell, and housing approximately 100 male inmates classified for minimum security incarceration at the Niantic Correctional Institution, which has until now been used only to house female prisoners.[4] Moreover, assigning a number of the HCCC's sentenced inmates to half-way houses is another option available to the defendants.

## THE CONSTITUTIONAL ISSUES

### A. Bell v. Wolfish

The starting point for the court's analysis of the plaintiffs' claims must be the decision of the Supreme Court in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Indeed, because the *Wolfish* opinion establishes the standards which govern this court's determination of the constitutionality of the conditions of confinement at HCCC, the facts, holding and analysis of that case merit close attention here.

*Wolfish* was a class action challenging the conditions of confinement at the Metropolitan Correctional Center ("MCC"), which the Supreme Court described as "a federally operated short-term custodial facility in New York City designed primarily to house pretrial detainees." *Bell v. Wolfish, supra,* 441 U.S. at 523, 99 S.Ct. at 1866. The MCC, constructed in 1975, "has as its primary objective the housing of persons who are being detained in custody prior to trial for federal criminal offenses in the United States District Courts" in the New York metropolitan area. *Id.* at 524, 99 S.Ct. at

4. Camp Hartell, which is located in the vicinity of Windsor (just north of Hartford) was, in a previous emergency, converted by the state from use as a National Guard camp to a jail for inmates who posed little or no security risk. *See* Tr. 116–18. Although the defendants' counsel argued that the prior experience at Camp Hartell (which then was used to house striking teachers) is of no relevance to the present situation, *see* Tr. 117–18, the record is devoid of evidence that Camp Hartell could not, with modifications, accommodate a significant number of low-security risk inmates. As defendants' counsel conceded, the facility at Niantic (an existing correctional institution maintained by the defendants) will be able to accommodate up to 100 male inmates "within the next few months." Tr. 119. *See Niantic to House Males from Overcrowded Jails,* Hartford Courant, Nov. 19, 1980, p. A5, col. 1. Connecticut officials have also recently explored the possible acquisition and renovation of a 500-bed facility in Shelton, the development of a 100-bed halfway house and reforms in judicial procedure to reduce the number of defendants sentenced to prison or detained pending trial. *See Advisers Discuss Increased Use of Promise to Appear in Court,* Hartford Courant, Dec. 19, 1980, p. A21, col. 1; *Manson Urges Tying Number of Sentences to Prison Beds,* Hartford Courant, Dec. 3, 1980, p. A9, col. 2.

1866. It also houses "some convicted inmates who are awaiting sentencing or transportation to federal prison or who are serving generally relatively short sentences," and others. *Id.*[5] The facilities there were described by the Supreme Court as follows:

> The MCC differs markedly from the familiar image of a jail; there are no barred cells, dank, colorless corridors, or clanging steel gates. It was intended to include the most advanced and innovative features of modern design of detention facilities. As the Court of Appeals [for the Second Circuit] stated: '[I]t represented the architectural embodiment of the best and most progressive penological planning.'"

*Bell v. Wolfish, supra,* 441 U.S. at 525, 99 S.Ct. at 1866, *quoting Wolfish v. Levi,* 573 F.2d 118, 121 (2d Cir. 1978).

*Wolfish* involved allegations of overcrowding at the MCC; in addition, the prisoners who brought that case "served up a veritable potpourri of complaints that implicated virtually every facet of the institution's conditions and practices." *Bell v. Wolfish, supra,* 441 U.S. at 526–27, 99 S.Ct. at 1867–1868. The Court of Appeals for the Second Circuit affirmed most of the rulings of the district court, which had granted wide-ranging relief to the plaintiffs. The Court of Appeals held that due process required that "pretrial detainees . . . be subjected to only those 'restrictions and privations' which 'inhere in their confinement itself or which are justified by the compelling necessities of jail administration.'" *Wolfish v. Levi, supra,* 573 F.2d at 124, *quoting Rhem v. Malcolm,* 507 F.2d 333, 336 (2d Cir. 1974). With respect to inmates who have been convicted and sentenced, the Court of Appeals held that "[t]he parameters of judicial intervention into the conditions of incarceration . . . are more restrictive." Specifically, the court held that "[a]n institution's obligation under the eighth amendment is at an end if it furnishes sentenced prisoners with adequate food, clothing, shelter, sanitation, medical care and personal safety." *Wolfish v. Levi, supra,* 573 F.2d at 125.

In *Wolfish,* the Supreme Court rejected the "compelling necessities" test applied by the Court of Appeals. The Court held that the Due Process Clause "provides no basis for application of a compelling-necessity standard to conditions of pretrial confinement that are not alleged to infringe any other, more specific guarantee of the Constitution." *Bell v. Wolfish, supra,* 441 U.S. at 533, 99 S.Ct. at 1871. In the absence of a claim that a more specific constitutional right has been infringed—*i. e.,* where the detainee alleges only that he has been denied "the protection against deprivation of liberty without due process of law"—the Court held that "the proper inquiry is whether [the] conditions [of detention] amount to punishment of the detainee." *Id.* at 535, 99 S.Ct. at 1872. The rationale for this standard, the Court noted, was that "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Id.* (footnote omitted).

The Court in *Wolfish* grappled with the question of what constitutes "punishment" under this standard. As the Court stated, "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense," since the government "obviously is entitled to employ devices that are calculated to effectuate" the detention of persons held pending trial. *Id.* at 537, 99 S.Ct. at 1873. The Court gave the following guidance to lower courts faced with the task of distinguishing impermissible "punishment" from constitutionally acceptable "regulatory restraints":

> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an express

---

5. These include "convicted prisoners who have been lodged at the facility under writs of habeas corpus *ad prosequendum* or *ad testificandum* issued to ensure their presence at upcoming trials, witnesses in protective custody, and persons incarcerated for contempt." *Bell v. Wolfish,* 441 U.S. 520, 524, 99 S.Ct. 1861, 1866, 60 L.Ed.2d 447 (1979) (footnote omitted).

intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal— if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees. Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.

*Id.* at 538–39, 99 S.Ct. at 1873–1874, *quoting Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–568, 9 L.Ed.2d 644 (1963) (citations and footnotes omitted; brackets in original).

The governmental interests which may justify conditions or restrictions of pretrial detainees are not limited to "ensuring the detainees' presence at trial," the Court held. *Id.* 441 U.S. at 540, 99 S.Ct. at 1874. Rather, "the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment." *Id.* (footnote omitted). The Court stressed that "[i]n determining whether restrictions or conditions are reasonably related to the government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed [the] warning that '[s]uch considerations are peculiarly within the province and professional expertise of corrections officials,'" to whose judgment the courts should defer in such matters. *Id.* at 540

n.23, 99 S.Ct. at 1875 n.23, *quoting Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974).

The Court in *Wolfish*, eschewing any "attempt to detail the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention," *id.* 441 U.S. at 540, 99 S.Ct. at 1874, held that on the facts of that case placing two inmates in a cell designed to house only one was not a form of impermissible "punishment." *Id.* at 541–42, 99 S.Ct. at 1875–1876. The court noted that detainees at the MCC

are required to spend only seven or eight hours each day in their rooms, during most or all of which they presumably are sleeping. The rooms provide more than adequate space for sleeping. During the remainder of the time, the detainees are free to move between their rooms and the common area.... Nearly all of the detainees are released within 60 days.... We simply do not believe that requiring a detainee to share toilet facilities and this admittedly small sleeping space with another person for generally a maximum of 60 days violates the Constitution.

*Id.* at 543, 99 S.Ct. at 1876 (footnotes omitted). Accordingly, the court held that

[w]hile confining a given number of people in a given amount of space in such a manner to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment, nothing even approaching such hardship is shown by this record.

*Id.* at 542, 99 S.Ct. at 1875 (footnote omitted).

In *Wolfish*, the Court also addressed the question of the constitutionality of certain limitations and restrictions on both pretrial detainees and sentenced inmates at the MCC. The Court summarized four principles "that inform [its] evaluation of the constitutionality" of such restrictions. *Id.* at 545, 99 S.Ct. at 1877. First, the Court reiterated that "convicted prisoners do not

forfeit all constitutional protections by reason of their conviction and confinement in prison." *Id.* Second, the Court noted that the rights of prisoners are "subject to restrictions and limitations" imposed not only by the fact that they are confined, but also by "the legitimate goals and policies of the penal institution." *Id.* at 545–46, 99 S.Ct. at 1877–1878. Third, "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of convicted prisoners and pretrial detainees." *Id.* at 546, 99 S.Ct. at 1877. Finally, prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547, 99 S.Ct. at 1878.

In view of these principles, the Court in *Wolfish* found that: (a) the MCC's policy of limiting inmates' receipt of books and magazines to publications mailed directly by publishers or book clubs was justified by security and administrative considerations; (b) the MCC's practice of not permitting inmates to receive, from outside the facility, packages containing food or personal property (except for one package of food at Christmas) was justified by the need to maintain security and diminish the risks of gambling, theft and fights among inmates; (c) unannounced searches by MCC staff members of the living quarters of inmates were permissible, since the Fourth Amendment does not prohibit such searches and the MCC's policy "facilitates the safe and effective performance" of them; and (d) the requirement of the Federal Bureau of Prisons that inmates at all federal facilities, including the MCC, expose their body cavities for visual inspection in the course of strip searches after contact visits was justified by the government's interest in preventing and detecting the smuggling of money, drugs, weapons and other contraband. The Court concluded that these policies and practices did not constitute impermissible "punishment" of pretrial detainees,

in violation of the Due Process Clause, *see id.* at 561–62, 99 S.Ct. at 1885–1886, any more than they violated the constitutional rights of the convicted inmates.

*Bell v. Wolfish* unquestionably establishes stringent standards to be met by those (such as the plaintiffs here) who challenge the constitutionality of the conditions of confinement of pretrial detainees and convicted inmates. However, it cannot fairly be stated, as one commentator argued, that the Court's test would not allow the inference of impermissible punishment except in "a case of 'loading a detainee with chains and shackles and throwing him in a dungeon.'" *The Supreme Court, 1978 Term*, 93 Harv.L.Rev. 60, 108 (1979), *quoting Bell v. Wolfish, supra*, 441 U.S. at 539 n.20, 99 S.Ct. at 1874 n.20. The holding of *Wolfish* imposes no such absolute bar to relief on claims of unconstitutional conditions of confinement falling short of that barbaric example. *See* Robbins, *The Cry of Wolfish in the Federal Courts: The Future of Federal Intervention in Prison Administration*, 71 J.Crim.L. & Criminology 211, 219 (1980). *Cf. Benjamin v. Malcolm*, 495 F.Supp. 1357, 1364 (S.D.N.Y.1980) (Lasker, J.) ("the *Wolfish* Court quite clearly indicates that overcrowding may constitute impermissible 'punishment' within the meaning of its opinion").

■ Under the Court's framework for analyzing cases such as this one, a determination of whether pretrial detainees or convicted inmates have been denied their constitutional rights requires analysis of whether specific conditions, policies and practices in particular cases are constitutionally justified. Under *Wolfish*, whether a challenged condition of confinement passes constitutional muster requires an inquiry into whether that condition or restriction "is reasonably related to a legitimate governmental objective," *Bell v. Wolfish, supra*, 441 U.S. at 539, 99 S.Ct. at 1874; *see id.* at 546, 99 S.Ct. at 1877 ("[t]his principle applies equally to pretrial detainees and convicted inmates"); this standard necessarily

contemplates a case-by-case analysis.[6] Those who read *Wolfish* more broadly, as an absolute prohibition on judicial scrutiny of conditions of confinement, ignore the plain language of the Supreme Court's opinion, including the Court's explicit reservation of the question whether overcrowding in circumstances other than those presented by the facts of *Wolfish* might violate the constitutional rights of inmates. *See Bell v. Wolfish, supra,* 441 U.S. at 542, 543 n.27, 99 S.Ct. at 1876 n.27.

It should therefore come as no surprise that the federal courts have not treated *Wolfish* as an insuperable obstacle to claims by pretrial detainees or sentenced inmates that specific conditions of confinement are unconstitutional, or to orders remedying unconstitutional conditions, including overcrowding, in jails and prisons. *See, e. g., Chapman v. Rhodes,* 624 F.2d 1099 (6th Cir. 1980), *aff'g without published opinion* 434 F.Supp. 1007 (S.D.Ohio 1977) (declaring unconstitutional the double-celling of convicted prisoners); *Campbell v. Cauthron,* 623 F.2d 503, 506–07 (8th Cir. 1980) (holding that overcrowding, including placing of inmates in multiple-bunk cells, violated due process rights of pretrial detainees and Eighth Amendment rights of convicted prisoners); *Adams v. Mathis,* 614 F.2d 42, 43 (5th Cir. 1980) (per curiam), *aff'g* 458 F.Supp. 302 (M.D.Ala.1978) (Johnson, J.) (holding that conditions, including overcrowding in cells and "dayrooms," violated constitutional rights of both pretrial detainees and convicted prisoners); *Benjamin v. Malcolm, supra,* 495 F.Supp. at 1364–65 (notwithstanding *Bell v. Wolfish,* district court ordered reduction in number of pretrial detainees held at house of detention on grounds that the case was factually distinguishable from *Wolfish* and that the defendants had stipulated, even after *Wolfish,* that the overcrowded conditions of confinement were unconstitutional); *Capps v. Ati-*

yeh, 495 F.Supp. 802, 813–15 (D.Or.1980) (holding that, notwithstanding *Wolfish,* overcrowded conditions violated sentenced inmates' Eighth Amendment rights); *West v. Lamb,* 497 F.Supp. 989, 991, 1004–05 (D.Nev.1980) (holding that overcrowded conditions violated the due process rights of pretrial detainees and the Eighth Amendment rights of convicted inmates, and imposing a "cap" on jail population); *Nicholson v. Choctaw County,* 498 F.Supp. 295 (S.D.Ala.1980) (holding that totality of conditions violated due process rights of pretrial detainees and Eighth Amendment rights of convicted inmates; ordering, *inter alia,* a ceiling on population of various large cells housing more than one inmate); *Hutchings v. Corum,* 501 F.Supp. 1276 (W.D.Mo.1980) (holding that overcrowding violated due process rights of pretrial detainees and Eighth Amendment rights of convicted inmates); *Hoptowit v. Ray,* No. 79–359 at 50–51, 56 (E.D.Wash. June 23, 1980) (holding that totality of conditions, including overcrowding, at penitentiary violated inmates' Eighth Amendment rights; ordering, *inter alia,* reduction of the inmate population); *Ramos v. Lamm,* 485 F.Supp. 122, 154–55, 169–70 (D.Colo.1979) (holding that totality of conditions, including overcrowding, at penitentiary violated Eighth Amendment rights of prisoners; ordering that prison be closed unless state submitted plan protecting constitutional rights of the prisoners). *Cf. Jordan v. Wolke,* 615 F.2d 749, 754–57 (7th Cir. 1980) (Swygert, J., dissenting); *Burks v. Teasdale,* 603 F.2d 59, 62–63 (8th Cir. 1979) (suggesting that district court consider whether double-celling should be eliminated at state penitentiary); *Washington v. Keller,* 479 F.Supp. 569 (D.Md.1979) (approving, over taxpayer's objection, a post-*Wolfish* consent decree eliminating double-celling and other overcrowded conditions at correctional institution); *Valentine v. Englehardt,* 474 F.Supp. 294,

---

**6.** As the *Wolfish* opinion makes clear at numerous points, in undertaking that analysis, a court must defer broadly to the judgment of prison administrators. At the same time, *Wolfish* did not repudiate the basic principle that a court reviewing claims of unconstitutional conditions must not "abdicate its constitutional responsi-

bility to delineate and protect fundamental liberties." *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974). *See Campbell v. Cauthron,* 623 F.2d 503, 505 (8th Cir. 1980). The defendants have conceded that this requires a case-by-case analysis. *See* Tr. 31.

299–302 (D.N.J.1979) (referring question of constitutionality of various restrictions on pretrial detainees' access to visits from friends and families to a special master for report, and holding practice of absolutely barring children as visitors unconstitutional, under *Wolfish* test).

**B. The Application of *Bell v. Wolfish* to Conditions at the HCCC**

■ Under *Bell v. Wolfish*, the court must determine: (1) whether the overcrowded living conditions of pretrial detainees at the HCCC constitute impermissible "punishment," as defined in *Wolfish*, and thus violate the Due Process Clause; (2) whether the overcrowded conditions in which "double-bunked" convicted prisoners live violate a specific constitutional provision—here, the prohibition of cruel and unusual punishment in the Eighth Amendment; and (3) whether conditions to which both pretrial detainees and convicted inmates are subjected, without regard to their status, violate the due process standard of *Wolfish*.[7]

**(1) *Overcrowding of Pretrial Detainees***

It has been established that many pretrial detainees are "double-bunked" in cells containing 60 to 65 square feet of space, 36 square feet of which are occupied by fixtures and furniture. Others are housed in the makeshift dormitory which the inmates call the "fishtank"; at a capacity of 9 inmates, the 200 square foot "fishtank" provides an average of less than 23 square feet per inmate (including the substantial area occupied by fixtures and furniture). Finally, other inmates who need neither medical nor psychiatric care are housed in the HCCC's hospital unit, sometimes sharing cells with inmates who are ill. They spend 23 hours a day in their cells, and are without access even to the inadequate and overcrowded "dayrooms" for recreation.

The overcrowding extends to the bulk of the time which pretrial detainees spend outside their cells or dormitory, for the "dayrooms" in which they pass much of the day (while watching television, reading, playing cards, and eating) are so crowded that the inmates have little room in which to move about. The court has already recounted the effects on the institution and the inmates of the overcrowding of both residential areas and "dayrooms." The overcrowding to which pretrial inmates are almost constantly subject has, *inter alia*, caused harm to the psychological and physical well-being of the inmates and posed a threat to the security of the institution.

As previously noted, under *Wolfish*, "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees," *id.* at 539, 99 S.Ct. at 1874. The Court noted that " '[t]here is, of course, a *de minimis* level of imposition with which the Constitution is not concerned.' " *Id.* at 539 n.21, 99 S.Ct. at 1874 n.21, *quoting Ingraham v. Wright*, 430 U.S. 651, 674, 97 S.Ct. 1401, 1414, 51 L.Ed.2d 711 (1977).[8]

On the record before this court, it is clear that the overcrowded conditions to which the defendants subject pretrial detainees at

---

**7.** The due process standard applicable to pretrial detainees also applies to the conditions of confinement of convicted prisoners to the extent that the latter are integrated or mixed with the former. *See White Eagle v. Storie*, 456 F.Supp. 302, 304–05 (D.Neb.1978); *Owens-El v. Robinson*, 442 F.Supp. 1368, 1374 (W.D.Pa. 1978); *O'Bryan v. County of Saginaw*, 437 F.Supp. 582, 596 (E.D.Mich.1977). In this case, the defendants have segregated the pretrial detainees from convicted prisoners in their housing. *See* Findings of Fact, ¶ 4. Therefore, the court's consideration of the latter group's confinement in "double-bunked" cells is governed by the stricter Eighth Amendment test, rather than the due process analysis of *Bell v. Wolfish, supra*. However, where the defendants have made no distinctions between pretrial detainees and convicted inmates—*e. g.*, with respect to counseling services, recreation and medical practices—the "Constitutional common denominator" of the due process clause, *O'Bryan v. County of Saginaw, supra*, 437 F.Supp. at 596, applies.

**8.** Although the Court in *Wolfish* held that the double-bunking at issue there did not violate the due process rights of the inmates, that decision may not fairly be read as holding that double-bunking is *always* constitutional. The Court wrote that "*[o]n this record*, we are con-

the HCCC represents a substantial, rather than a *de minimis,* imposition. The conditions at the HCCC impose on inmates greater hardship than did conditions at the MCC. Many of the pretrial detainees in the plaintiff class are forced to live in cells and dormitory accommodations which leave them with approximately one-half as much space as is prescribed, as minimally acceptable, by experts (including administrators of correctional facilities) concerned with the architecture of jails and prisons and the establishment of generally recognized correctional standards.[9] This is even less space

vinced as a matter of law that 'double-bunking' *as practiced at the MCC* did not amount to punishment and did not, therefore, violate respondents' rights under the Due Process Clause ...." 441 U.S. at 541, 99 S.Ct. at 1875 (emphasis added). The opinion in *Wolfish* implies that on other factual records such double-bunking might well be unconstitutional. *See Benjamin v. Malcolm,* 495 F.Supp. 1357, 1364 (S.D. N.Y.1980).

**9.** As noted above, a "double-bunked" inmate at the HCCC has approximately 30 to 32½ square feet of space (including space occupied by fixtures and furniture), while an inmate assigned to the "fishtank" has less than 23 square feet of space (calculated the same way, on the assumption of 9 inmates in the "fishtank"). By way of contrast the plaintiffs have called the court's attention to the following standards:

(a) The United Nations Standard Minimum Rules for the Treatment of Prisoners, adopted by the First United Nations Congress on the Prevention of Crime and Treatment of Offenders in 1955, and approved by the Economic and Social Council of the United Nations by its Resolutions 663C (LLIV) on July 31, 1957 and 2076 (LXII) on May 13, 1977. The Standard Minimum Rules—which were *explicitly adopted* as the "Preamble to The Administrative Directives of the Connecticut Department of Correction" by the Connecticut Department of Correction on November 8, 1974, *see* Plaintiffs' Exhibit G–2—prohibit double-bunking. In adopting the Standard Minimum Rules, the Department acted in accordance with *Conn.Gen.Stat.* § 18–81, which provides that the Commissioner of Correction "shall establish rules for the administrative practices ... of [state correctional] institutions and facilities *in accordance with recognized correctional standards.*" (emphasis supplied).

Article 9(1) of the Standard Minimum Rules provides that "each prisoner shall occupy by night a cell or room by himself." In 1974 the Connecticut Department of Correction noted that this rule was "[c]urrently in effect at all units of the Department except at Community Correctional Centers at New Haven and Hartford, where new facilities, projected for completion in July 1975 and February 1976 [*i. e.,* the HCCC], respectively, will enable total compliance." Plaintiffs' Exhibit G–2 at 2 n.2. Article 86 of the Standard Minimum Rules

provides that pretrial detainees "shall sleep singly in separate rooms, with the reservation of different local custom in respect of the climate." The Department made no observation that, as of 1974, it was not in compliance with this rule.

(b) The Commission on Accreditation for Corrections' Manual of Standards for Adult Correctional Institutions, sponsored by the American Correctional Association, an organization whose members are corrections administrators from all parts of the country. The Manual provides that in a detention facility there should be one inmate per room or cell, each of which has a floor area of at least 60 square feet. Exhibit O at 21. It also calls for a minimum floor area of 50 square feet for dormitory accomodations where these are used. *Id.*

(c) The National Sheriffs' Association Handbook on Jail Architecture. This publication, prepared in 1975, stated that "[i]ndividual detention rooms must be provided for each inmate who is detained for longer than 4 to 8 hours and that "[s]ingle occupancy detention rooms should average 70 to 80 square feet in area." Exhibit G–3 at 62–63.

(d) The Guidelines for the Planning and Design of Regional and Community Correctional Centers for Adults, established by the Department of Architecture of the University of Illinois, which call for individual rooms. Exhibit G–1.

(e) The Standards for Health Services in Correctional Institutions of the American Public Health Association, which call for 60 square feet of space per inmate. Exhibit X at 62.

While the Court in *Bell v. Wolfish* noted that such standards, taken as the recommendations of various groups, "do not *establish the constitutional minima,*" it also stated that they "may be instructive in certain cases." *Id.,* 441 U.S. at 544 n.27, 99 S.Ct. at 1876 n.27. It is in that light that the court refers to such standards, as did the courts in *Ramos v. Lamm,* 485 F.Supp. 122, 154 (D.Colo.1979) (citing American Public Health Association standard of 60 square feet per inmate, in post-*Wolfish* case); *Capps v. Atiyeh,* 495 F.Supp. 802, 809–810 (D.Or.1980) (citing various criteria calling for 55 or more square feet per prisoner); and *Hoptowit v. Ray,* No. 79–359 at 8 (E.D.Wash. June 23, 1980) (referring to Manual of Standards for Adult Correctional Institutions). *Cf. Chapman v.*

*Rhodes*, 434 F.Supp. 1007, 1021 (S.D.Ohio 1977), *aff'd without opinion*, 624 F.2d 1099 (6th Cir. 1980) (referring to a number of criteria which call for minima of between 50 and 75 square feet per prisoner).

Apart from Connecticut's administrative adoption of the United Nations Standard Minimum Rules for the Treatment of Prisoners, those standards may be significant as expressions of the obligations to the international community of the member states of the United Nations, *cf. Filartiga v. Pena-Irala*, 630 F.2d 876, 883 (2d Cir. 1980), and as part of the body of international law (including customary international law) concerning human rights which has been built upon the foundation of the United Nations Charter. *See generally* Buergenthal, *Codification and Implementation of International Human Rights* 15–19 in Human Dignity: The Internationalization of Human Rights (A. Henkin ed. 1978). It is well established that customary international law is part of the law of the United States. *See, e. g., The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900); L. Henkin, Foreign Affairs and the Constitution 221 (1972). The United Nations Charter is, of course, a treaty ratified by the United States. 59 Stat. 1031, T.S. No. 993 (1945). Although not self-executing, *see Hitai v. Immigration & Naturalization Service*, 343 F.2d 466, 468 (2d Cir. 1965), the Charter's provisions on human rights are evidence of principles of customary international law recognized as part of the law of the United States. *See Filartiga v. Pena-Irala, supra*, 630 F.2d at 881–82 & n.9; *see generally United States v. Toscanino*, 500 F.2d 267, 277 (2d Cir. 1974); *Restatement of the Foreign Relations Law of the United States (Revised)* §§ 102(1)(b), 102(3), 131 & Comment h to § 102 (Tent. Draft. No. 1, 1980). Article 55 of the Charter provides that the United Nations shall promote the observance of human rights; in Article 56 the member states pledge "to take joint and separate action in cooperation with the Organization for the achievement" of the goals of Article 55; and Article 62(2) of the Charter authorizes the Economic and Social Council of the United Nations to "make recommendations for the purpose of promoting respect for, and observance of, human rights and fundamental freedoms for all."

In adopting the Standard Minimum Rules for the Treatment of Prisoners, the Economic and Social Council acted in furtherance of this mandate to set international standards promoting the observance of human rights. *See generally* J. Carey, UN Protection of Civil and Political Rights 9–16 (1970); M. McDougal, H. Lasswell & L. Chen, Human Rights and the World Public Order 332–35 (1980); McDougal & Bebr, *Human Rights in the United Nations*, 58 Am.J.Int'l L. 603, 613–14 (1964). The United States took a leading role in the promulgation of the human rights provisions of the United Nations Charter, and in the program to implement those provisions of the Charter. President Truman stated in his closing address to the San Francisco Conference: "Under this document we have good reason to expect an international bill of rights acceptable to all the nations involved. That Bill of Rights will be as much a part of international life as our own Bill of Rights is part of our Constitution." 1 U.N.C.I.O. Docs. 717 (1945), *quoted in* McDougal & Bebr, *supra*, 58 Am.J.Int'l L. at 613. *See generally* McDougal & Leighton, *The Rights of Man in the World Community: Constitutional Illusions Versus Rational Action*, 59 Yale L.J. 60 (1949) (arguing for an active American role in support of the United Nations' program for human rights); Nayar, *Human Rights: The United Nations and United States Foreign Policy*, 19 Harv.Int'l L.J. 813, 824–26 (1978) (noting recent American government actions to implement the obligations to promote human rights contained in the United Nations Charter).

⋏ The adoption of the Standard Minimum Rules by the First United Nations Congress on the Prevention of Crime and Treatment of Offenders and its subsequent approval by the Economic and Social Council does not necessarily render them applicable here. However, these actions constitute an authoritative international statement of basic norms of human dignity and of certain practices which are repugnant to the conscience of mankind. The standards embodied in this statement are relevant to the "canons of decency and fairness which express the notions of justice" embodied in the Due Process Clause. *See Rochin v. California*, 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952), *quoting Malinski v. New York*, 324 U.S. 401, 417, 65 S.Ct. 781, 789, 89 L.Ed. 1029 (1945) (Frankfurter, J., concurring); *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 469, 67 S.Ct. 374, 379, 91 L.Ed. 422 (1947) (Frankfurter, J., concurring) ("a state may be found to deny a person due process by treating even one guilty of crime in a manner that violates standards of decency more or less universally accepted . . . ."). The due process guarantees in our Constitution are based on a concept which "is not final and fixed," but evolves on the basis of judgments "reconciling the needs both of continuity and of change in a progressive society." *Rochin v. California, supra*, 342 U.S. at 170, 171, 72 S.Ct. at 208–209. *Cf. Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (Eighth Amendment prohibits punishment transgressing "the evolving standards of decency that mark the progress of a maturing society"); *Rudolph v. Alabama*, 375 U.S. 889, 890 & n.1, 84 S.Ct. 155, 11 L.Ed.2d 119 (1963) (Goldberg, J., dissenting from denial of *certiorari*) (citing Economic and Social Council resolution as relevant to question whether Eighth Amendment has been violated). In this regard, it is significant that

than was afforded the "double-bunked" inmates in *Wolfish*.[10] Moreover, unlike the conditions in *Wolfish*, such overcrowding cannot be avoided by inmates while they are outside their cells,[11] and has been established to have caused injury to the mental and physical well-being of pretrial detainees. Unlike *Wolfish*, a substantial number of inmates here are confined in double-bunked cells for periods of more than 60 days. On these facts the court finds that the pretrial detainees at the HCCC are confined "in a given amount of space in such manner as to cause them to endure genuine privations and hardship over an extended period of time." *Bell v. Wolfish, supra*, 441 U.S. at 542, 99 S.Ct. at 1875.

■ Under *Bell v. Wolfish*, such a finding is not the end of the inquiry. Rather, the court must determine whether the privations endured by the pretrial detainees are justifiable on the facts of the case. *See Bell v. Wolfish, supra*, 441 U.S. at 538–39, 99 S.Ct. at 1873–1874. In doing so, the court must defer broadly to the defendants' expertise and administrative discretion, but also must determine whether there is some minimal nexus between the defendants' practices and a legitimate objective of the HCCC's management. Absent a showing by the defendants of that kind of connec-

tion, the defendants have failed to "dispel [the] inference that such restrictions are intended as punishment," *id.* at 540, 1874 (footnote omitted), and are therefore impermissible under the Due Process Clause.

■ The record of this case is devoid of any indication that placing two inmates in a 60- or 65-square foot cell, or fifteen to twenty inmates in a 200-square foot "dayroom" while they are not in their cells or dormitory, or confining inmates not suffering from any disease or disorder to a cell in the hospital area (which they must sometimes share with inmates who are ill) for 23 hours a day, furthers in the least any legitimate purpose of the defendants—whether it be "ensuring a detainee's presence at trial," *Bell v. Wolfish, supra*, 441 U.S. at 540, 99 S.Ct. at 1874, "maintaining security and order," *id.*, or anything else which might have any tendency to promote "the effective management of the detention facility." *Id.* To the contrary, on the record before this court, the overcrowded conditions at the HCCC have increased security problems [12] and made more difficult the effective management of the institution.[13] In passing, the court notes that this cause-and-effect relationship between extreme over-

---

federal courts—including the Supreme Court and the Court of Appeals for the Second Circuit—have invoked the Standard Minimum Rules for guidance in particular cases. *See, e.g., Estelle v. Gamble, supra,* 429 U.S. at 103–104 & n.8, 97 S.Ct. at 290–291 & n.8 (citing the Standard Minimum Rules as evidence of "contemporary standards of decency" for purposes of the Eighth Amendment); *Detainees of Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392, 396 (2d Cir. 1975) (referring to the single cell provision of the Standard Minimum Rules).

**10.** Each of the rooms at the MCC, with which the *Wolfish* case was concerned, had a total floor space of approximately 75 square feet, *Bell v. Wolfish, supra,* 441 U.S. at 541, 99 S.Ct. at 1875, compared to the 60 to 65 square feet of the cells at the HCCC. Moreover, *Wolfish* did not involve makeshift dormitory housing providing inmates with as little as 23 square feet of space per person.

**11.** For nearly all pretrial detainees (and most sentenced inmates as well) the major alterna-

tive to spending time in the cells (or the "fish-tank") is to pass time in overcrowded "dayrooms." *See* Findings of Fact, ¶ 95, as modified by order of the court, Dec. 19, 1980. As noted in the court's Findings of Fact (*see* ¶ 65), although inmates may choose between these alternatives for given blocks of time, they do not have the right, as did the plaintiffs in *Wolfish,* to "move about freely between their rooms and the common areas," *Bell v. Wolfish, supra,* 441 U.S. at 541, 99 S.Ct. at 1875. Nothing in the *Wolfish* opinion indicates that the plaintiffs there contended (as do the plaintiffs here) that the overcrowding in the "dayrooms" was violative of their constitutional rights. The inmates assigned to cells in the medical area of the HCCC do not even have the privilege of choosing to spend time in a "dayroom"; they remain in their cells 23 hours every day. *See* Findings of Fact, ¶¶ 47, 48.

crowding and breakdowns in discipline is not unusual or unprecedented. Although the very nature of incarceration may render disciplinary problems inevitable, *see generally* M. Foucault, Discipline and Punish: The Birth of the Prison 266–68 (Vintage ed. 1979), experience confirms that overcrowded conditions of confinement may aggravate such problems and lead to the collapse of discipline, including violence within correctional institutions. *See, e. g., Capps v. Atiyeh, supra,* 495 F.Supp. at 811 ("the increased potential for violence is one of the most significant effects of overcrowding" in correctional facilities, as demonstrated by expert testimony and the admissions of correctional administrators); *Hoptowit v. Ray, supra,* at 9 (overcrowding found to have increased the possibility of violence at penitentiary); B. McKelvey, American Prisons 6–7, 81–82 (1936).[14]

The overcrowded conditions at the HCCC, which have been demonstrated to have had serious effects on the welfare of pretrial detainees,[15] have not been justified by the defendants as being "reasonably related to a legitimate goal," *Bell v. Wolfish, supra,* 441 U.S. at 539, 99 S.Ct. at 1874.[16] On the facts of this case, the court therefore draws the inference, expressly permitted by the Supreme Court's decision in *Bell v. Wolfish,* that the purpose of the defendants' overcrowding of the facility "is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* It necessarily follows, under the test of *Bell v. Wolfish,* that the defendants have violated the due process rights, guaranteed by the Fourteenth Amendment to the United States Constitution, of pretrial inmates at the HCCC. In so holding, the court in no way contravenes the Supreme Court's dictum that there is no " 'one man, one cell' principle lurking in the Due Process Clause," *Bell v. Wolfish, supra,* 441 U.S. at 542, 99 S.Ct. at 1875. Rather, it finds that even under the stringent test of *Bell v. Wolfish,* the overcrowded conditions at the HCCC are so egregious and so unsupported by any rational or legitimate justification that they are unconstitutional insofar as they affect the pretrial detainees in the plaintiff class.

**12.** The importance of this factor is underscored by the Supreme Court's observation that "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). This dictates deference to correctional administrators' decisions which further institutional security interests even at the expense of specific constitutional rights of inmates, *see Bell v. Wolfish, supra,* 441 U.S. at 546–47, 99 S.Ct. at 1877–1878. However, it would appear to cut the other way where, as here, the decisions of the administrators jeopardize, rather than promote, the security of the facility. *See* Findings of Fact, ¶¶ 43, 49–50, 60, 62, 64; *cf.* Tr. 56–57 (admission by defendants' counsel that security at the HCCC is not enhanced by overcrowding, and disclaimer of the argument that security considerations justify such overcrowding); Tr. 130 (admission by Commissioner Manson that security problems increase with the number of inmates).

**13.** *Cf. Benjamin v. Malcolm,* 495 F.Supp. 1357, 1363 (S.D.N.Y.1980) (overpopulation at house of detention resulted in harm to security and management, by causing an "atmosphere of tension and hostility, a strain on all of the institution's facilities, and interference with supervision, protection and provision of services to members of the plaintiff class," as stipulated by the parties).

**14.** William Carbone, the executive director of the Connecticut Justice Commission, recently stated: "I don't think there's any question but that overcrowding [in correctional institutions] increases tension and tension leads to violence." *Jammed Prisons May Explode, State Warned,* New Haven Register, Dec. 3, 1980, p. 1, col. 1. The Connecticut Justice Commission is a part of the executive branch of state government established, *inter alia,* to "develop a comprehensive statewide action plan for . . . the improvement of the criminal and juvenile justice systems in Connecticut," and "[t]o advise the governor and the general assembly on legislation and other significant matters pertaining to law enforcement improvement, criminal and juvenile justice reform and the prevention of crime, and prepare and recommend legislation to the governor for the improvement of the criminal and juvenile justice systems."

Conn.Gen.Stat. § 29–181(a), (s). *Cf. Burger Says Threat of Prison Violence Is Growing,* N.Y. Times, Dec. 29, 1980, p. A13, col. 1 (statement of the Chief Justice of the United States, in his year-end summary of the problems and accomplishments of the judiciary, on overcrowding and violence in American prisons).

15. *See* Findings of Fact, ¶¶ 42–43, 52–53, 58, 68, 85, 110, 112.

16. The record of these cases is devoid of *any* rationale for the overcrowded conditions at the HCCC. At oral argument, the defendants' counsel explained the state's interest in housing so many inmates at the HCCC as follows:

The Court: What is your justification for double celling? Exactly what state interest does double celling serve?

Mr. O'Neill: I suppose to get to the basic elements of the double celling is that Connecticut courts send people to the custody of the Commissioner of Corrections [sic]; whatever their reasoning, either because they've been sentenced or because they have set a bond which the inmate cannot meet. It is then the job of the Commissioner to provide a correctional system, a functioning correctional system or facility for them, to go to.

*He just doesn't have enough individual cells at the Hartford jail to give every inmate a single cell.*

Tr. 57–58 (emphasis added). The defendants' argument may appear to be based on a lack of adequate resources, a form of the argument (familiar in cases such as this one) that the cost to the state of alternatives to the challenged conditions justifies those conditions. However, as Judge Lasker recently noted in this context, "the decisions of the courts are legion that cost burden is not a defense to the deprivation of constitutional rights." *Benjamin v. Malcolm,* *supra,* 495 F.Supp. at 1363. If the state were to be excused from adhering to the United States Constitution whenever it deemed compliance too costly, it would be free in some cases to violate constitutional rights (and indeed effectuate a *de facto* repeal of rights guaranteed by the federal Constitution) merely by refusing to appropriate funds. The cases establish that the law does not sanction such an absurdity. *See, e. g., Campbell v. Cauthron,* 623 F.2d 503, 508 (8th Cir. 1980); *Turpin v. Mailet,* 579 F.2d 152, 165 n.38 (2d Cir. 1978); *Todaro v. Ward,* 565 F.2d 48, 54 n.8 (2d Cir. 1977); *Detainees of Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392, 399 (2d Cir. 1975); *Rhem v. Malcolm,* 507 F.2d 333, 342 (2d Cir. 1974). Without denigrating the state's interest in preserving the public fisc, the court cannot regard the incremental financial hardship on the state of providing minimally acceptable living conditions as a legitimate excuse for the overcrowded conditions at the HCCC. The conscious and knowing refusal of a state to make available the resources necessary to fulfill its basic con-

stitutional obligations cannot possibly justify the state's constitutional default; to hold otherwise would be to sanction any deviation from constitutional norms which is directly attributable to budgetary decision-making. If it is true that there is no "'one man, one cell' principle lurking in the Due Process Clause," *see Bell v. Wolfish, supra,* 441 U.S. at 542, 99 S.Ct. at 1875, surely there is no principle lurking anywhere in the Constitution which permits a state to avoid compliance with constitutional requirements by invoking the preferences of budget-makers in the state legislature or the state executive branch.

In any event, the evidence concerning costs in this case is inconclusive; while the state suggests that improving the conditions of the plaintiffs' confinement will be costly, there is evidence that placing inmates in halfway houses—a measure which the state could undertake with regard to many of the pretrial detainees—may be less expensive than keeping them at the HCCC. *See* Findings of Fact, ¶ 69.

Whether because the law regards it as an insufficient justification or because the facts of this case do not support it, the state does not press the proposition that the inadequacy of its resources justifies the overcrowding of the HCCC. At oral argument, defendants' counsel disclaimed the position (apparently taken in the above-quoted statement) that inadequate resources was the state's reason for overcrowding the HCCC, *see* Tr. 58, 60, and argued as follows:

The Court: Well, I'm still trying to find out what the state interests are that would be served by double celling.

Mr. O'Neill: *The state interest, your Honor, is that the state has to provide a correctional system to accommodate people.*

The Court: And it just doesn't have the space?

Mr. O'Neill: Accommodate people that are sent to it by the courts, that's correct.

. . .

The Court: . . . The question I'm asking is what state interest is served by double celling? That's the question.

Mr. O'Neill: That the jail provides—

The Court: You haven't told me what the interest is.

Mr. O'Neill: *The interest, as best I can state it, your Honor, is that the Hartford jail provides a functioning system whereby inmates are fed, they're clothed, they have shelter, they have medical care, they have visiting, they have recreation, they have counseling, they have access to their attorneys, they have access to their families;* not as in some respects perhaps not as complete as everybody would like it to be, perhaps not as complete as it will be when Cheshire opens, perhaps not as complete [as] if the courts did not send that many people to jail.

But the Hartford jail *provides those services* in a constitutional manner. *That's the public*

### (2) *Overcrowding of Sentenced Inmates*

A different constitutional standard applies to the defendants' treatment of sentenced inmates. For sentenced inmates the question posed by the allegation that overcrowding violates the Constitution is whether those conditions contravene the Eighth Amendment's prohibition of "cruel and unusual punishment." In the prison context, the Supreme Court has stated:

> The Eighth Amendment's ban on inflicting cruel and unusual punishments, made applicable to the States by the Fourteenth Amendment, "proscribe[s] more than physically barbarous punishments." *Estelle v. Gamble*, 429 U.S. 97, 102 [97 S.Ct. 285, 290, 50 L.Ed.2d 251] [(1976)]. It prohibits penalties that are grossly disproportionate to the offense, *Weems v. United States*, 217 U.S. 349, 367 [30 S.Ct. 544, 549, 54 L.Ed. 793] [(1910)], as well as *those that transgress today's " 'broad and idealistic concepts of dignity, civilized standards, humanity and decency.' " Estelle v. Gamble, supra,* [429 U.S.] at 102 [97 S.Ct. at 290,] quoting *Jackson v. Bishop*, 404 F.2d 571, 579 (CA 8 1968). Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards.

*Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978) (emphasis added).

There is no clear test by which conditions of confinement may be measured to determine whether they "are incompatible with 'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle v. Gamble, supra,* 429 U.S. at 102, 97 S.Ct. at 290, *quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). Because this test has been held to be more stringent than that governing the due process rights of pretrial detainees, *see Wolfish v. Levi,* 573 F.2d 118, 125, 127 (2d Cir. 1978), *rev'd on other grounds sub nom. Bell v. Wolfish, supra,* the Court's inquiry is limited to determining whether the defendants have violated their duty to "provid[e] adequate housing" for sentenced inmates. *Id.* at 127.

There is no need to belabor the effects of overcrowded conditions on inmates at the HCCC. As noted previously, inmates—including those who have been convicted and sentenced—are required to live in such close quarters that their physical and mental well-being is harmed.[17] The "evolving standards of decency" with which the overcrowding of inmates at the HCCC are incompatible include the Standard Minimum Rules for the Treatment of Prisoners, which have been adopted by the United Nations Economic and Social Council (the members of which include some nations whose standards of decency and human rights are far less stringent than our own) and thus form part of the body of international human rights principles establishing standards for

---

function that the Hartford jail, as I see it, that the Hartford jail performs.

. . .

The Court: If I find that the conditions are so bad at the HCCC that I must infer that punishment within the meaning of *Wolfish* is going on, how would you rebut that inference by showing a logical connection between the overcrowded conditions at the HCCC and some legitimate state objective in running your institutions, as opposed to merely saving money? That's really the question I'm trying to put to you.

Mr. O'Neill: *The state objective, as I see it, is this, your Honor*—and it starts with the courts: that *there are judicial actions which end up in the incarceration of certain people. The Commissioner has nothing to do with those actions,*

but there are judicial actions which result in that situation.

Tr. 59–63 (emphasis added). It would appear that the defendants' ultimate argument is that the conditions at the HCCC are justified by the need to house, feed and clothe the persons who are sent to the facility by courts. While this is surely ample justification for having a facility such as the HCCC in Hartford, it is no excuse for either the egregious overcrowding there or the harmful results of that overcrowding. The court must therefore conclude that the state has failed to articulate, much less prove, any legitimate interest justifying the conditions from which the court has inferred the existence of "punishment" under the test of *Bell v. Wolfish, supra.*

**17.** *See* Findings of Fact cited in note 15, *supra.*

decent and humane conduct by all nations.[18] *See Estelle v. Gamble, supra,* 429 U.S. at 103–04 & n.8, 97 S.Ct. at 290–291 n.8 (citing the Standard Minimum Rules as evidence of "contemporary standards of decency").

The defendants themselves have embraced these international standards. In 1974, the defendants adopted the Standard Minimum Rules as the preamble to the Administrative Directives of the Connecticut Department of Correction.[19] This action was apparently taken pursuant to Commissioner Manson's statutory mandate to promulgate "rules for administrative practices . . . *in accordance with recognized correctional standards.*" Conn.Gen.Stat. § 18–81 (emphasis added).

█ There may be no absolute prescription of "one man, one cell" in the Eighth Amendment. However, at the HCCC convicted inmates are subject virtually all the time to institutionalized overcrowding which violates not only the standards embraced by the defendants themselves, but also other, less demanding, correctional standards which are generally recognized. *See, e. g., Campbell v. Cauthron, supra,* 623 F.2d at 506–07 (housing inmates in multiple-person cells giving as little as 18 to 26 square feet of space per prisoner, in violation of state Criminal Detention Facilities Board's minimum design standards, violated the Eighth Amendment); *Battle v. Anderson,* 564 F.2d 388, 395 (10th Cir. 1977) (holding that the "contemporary standards of human decency" embodied in the Eighth Amendment require 60 square feet of space per prisoner in cells and 75 square feet per prisoner in dormitories, as suggested by American Public Health Association standards); *Hoptowit v. Ray, supra,* No. 79–359 at 7–9, 50 (overcrowded housing conditions for sentenced inmates which afforded them substantially less space than minimum standards, such as those of the American Correctional Association, violated their Eighth Amendment rights); *Capps v. Atiyeh, supra* (holding unconstitutional under the Eighth Amendment the double-celling of inmates

---

**18.** *See* note 9, *supra.* The relevance of international norms such as the Standard Minimum Rules to the determination of the "evolving standards of decency" which are basic to our Eighth Amendment jurisprudence is underscored by Article 7 of the International Covenant on Civil and Political Rights, which prohibits "cruel, inhuman or degrading treatment or punishment" of individuals. The Covenant (which, in Article 7, parallels the Eighth Amendment to the United States Constitution) is an international treaty; although it has not been ratified by the United States Senate, it is not necessarily without significance for this country (which signed it on October 5, 1977, *see U.S., Fulfilling Promise, Signs 11-Year Old Rights Pacts at U.N.,* N.Y. Times, Oct. 6, 1977, p. A2, col. 5), since "multilateral agreements designed for adherence by states generally . . . may come to be law for non-parties by virtue of state practice and *opinio juris* resulting in customary law." Comment f to *Restatement of the Foreign Relations Law of the United States (Revised)* § 102 (Tent. Draft No. 1, 1980). Similarly, Article 5 of the Universal Declaration of Human Rights prohibits "cruel, inhuman or degrading treatment or punishment." As the Court of Appeals for the Second Circuit recently observed, the United Nations General Assembly "has declared that the [UN] Charter precepts embodied in the Universal Declaration [of Human Rights] 'constitute basic principles of international law.'" *Filartiga v. Pena-Irala,* 630 F.2d 876, 882 (2d Cir. 1980), *quoting* G.A.

Res. 2625 (XXV) (Oct. 24, 1970). The Universal Declaration is "'an authoritative statement of the international community,'" *id.* at 883, *quoting* E. Schwelb, Human Rights and the International Community 70 (1964), which "creates an expectation of adherence, and 'insofar as the expectation is gradually justified by State practice, a declaration may by custom become recognized as laying down rules binding upon the States.'" *Id., quoting* 34 U.N. ESCOR, Supp. (No. 8) 15, U.N. Doc. E/cn. 4/1/610 (1962) (memorandum of Office of Legal Affairs, U.N. Secretariat). As our Court of Appeals noted in *Filartiga,* "several commentators have concluded that the Universal Declaration has become, *in toto,* a part of binding, customary international law." *Id. See* Schluter, *The Domestic Status of the Human Rights Clauses of the United Nations Charter,* 61 Cal. L.Rev. 110, 145–46 (1973); *cf. Nguyen Da Yen v. Kissinger,* 528 F.2d 1194, 1201 n.13 (9th Cir. 1975).

**19.** *See* notes 9 and 18, *supra.* As the Preamble to the Department's Administrative Directives, the Standard Minimum Rules—including the rule of a single cell for each inmate—concededly constitute (at the very least) "guidelines" for the Department. *See generally* Tr. 67–74. At a minimum, it is the Department's acknowledged "goal" to comply with these standards. *See* Tr. 66, 74.

in cells of 51 to 68 square feet and the confinement of inmates in dormitories giving them an average of 43 square feet of space). Moreover, here the defendants have not argued (much less established) that the suffering endured by inmates "would serve any penological purpose." *See Estelle v. Gamble, supra,* 429 U.S. at 103, 97 S.Ct. at 290.[20] In these circumstances, the court cannot avoid holding that the defendants have violated their duty under the Eighth Amendment to provide adequate housing for convicted inmates at the HCCC.

### (3) *Other Conditions of Confinement*

Although the grossly overcrowded conditions at the HCCC are at the heart of these cases, the plaintiffs have also alleged that other conditions at that institution violate their constitutional rights. The plaintiffs complain of a breakdown in the delivery of medical and psychiatric service at the HCCC, the inadequacy of counseling services, a decline in sanitary conditions, and allegedly inadequate food services and opportunities for recreation. While the court has found that there are inadequacies in most of these areas, those deficiencies appear, with one important exception, to be so closely tied to the overcrowding of the HCCC that they can be remedied by an order which places a "ceiling" on the number of inmates at the institution in order to correct the constitutional violations discussed in Parts B(1) and B(2) of this decision. Because such a simple order (which would in any event be necessary to correct the major unconstitutional condition at the institution) will alleviate these ancillary problems, and because the courts may not become "enmeshed in the minutiae of pris-

on operations," *Bell v. Wolfish, supra,* 441 U.S. at 562, 99 S.Ct. at 1886, or supervise "the day-to-day operation of a corrections facility," *id.* at 547, 99 S.Ct. at 1878, I decline to rule that the defendants' practices with respect to providing medical and psychiatric treatment, counseling, sanitation services, food and recreation are themselves unconstitutional.

There is, however, one practice of the defendants which, standing alone, violates the Due Process Clause of the Constitution. The defendants have failed adequately to screen newly arrived inmates in order to identify and segregate from other inmates persons carrying communicable diseases. The threat posed to the health of all HCCC inmates by this practice is obvious. A medical "screening" examination shortly after admission to a correctional facility is therefore widely recognized to be essential to the health of inmates. *See* American Medical Association, *Standards for Health Services in Jails* 21–23 (1979); American Bar Association Commission on Correctional Facilities and Legal Services, *Medical and Health Care in Jails, Prisons and Other Correctional Facilities* 7, 16, 19 (3d ed. 1974). Moreover, section 19–13–A10(2) of the Regulations of Connecticut State Agencies provides that "[t]he warden ... in charge of any prison or jail shall notify the prison or jail physician, in writing, within twenty-four hours upon the receipt of a prisoner who may have been exposed to a communicable disease ....."; it is impossible for the warden to comply with this regulation unless his staff performs adequate examinations for communicable diseases.[21] There is no evidence that any in-

---

**20.** *See* note 16, *supra.*

**21.** There is no merit to the suggestion of the defendants' counsel that the communicable diseases referred to in the relevant section of the regulation include only "venereal disease, that sort of thing." Tr. 93; *see also* Tr. 91. A reading of section 19–13–A10(2) makes clear that the warden has an affirmative obligation to report the possible exposure of any newly arrived inmate to *any* communicable disease as well as a separate duty to inform the jail physician of inmates who have been convicted of

sex-related offenses. The entire subsection reads as follows (emphasis added):

The warden or other person in charge of any prison or jail in the state shall notify the prison or jail physician, in writing, within twenty-four hours upon the receipt of a prisoner who may have been exposed to a communicable disease *and* of every prisoner who has been convicted of any offense involving sexual promiscuity or illicit sex relations. The phrase "communicable disease" is broadly defined by the Connecticut State Regulations. Section 19–13–A1(6) defines the term thus:

mates at the HCCC have yet contracted communicable diseases as a result of the defendants' failure to screen, identify and isolate cases of such diseases. Nevertheless, the resulting threat to the well-being of the inmates is so serious, and the record so devoid of any justification for the defendants' policy, that under the standard of *Bell v. Wolfish* this practice constitutes "punishment" in violation of the Due Process Clause.[22]

## Conclusion

On the facts of these cases, the overcrowding of the HCCC violates the due process rights of the pretrial detainees and the right of sentenced inmates to be free from "cruel and unusual punishment." Moreover, the lack of screening procedures which would ensure the identification and segregation of inmates carrying contagious diseases violates the constitutional rights of all the inmates at the HCCC. While the myriad other conditions of which the plaintiffs have complained are probably unpleasant for the inmates, none of these consequences of overcrowding are in and of themselves unconstitutional, and they will surely be ameliorated by an order protecting the inmates from the overcrowding which is at the heart of these cases.

The court recognizes that "state and local authorities have primary responsibility for curing constitutional violations" in correctional institutions. *See Hutto v. Finney, supra*, 437 U.S. at 687 n.9, 98 S.Ct. at 2572 (1978). "If, however, '[those] authorities fail in their affirmative obligations . . . judicial authority may be invoked.'" *Milliken v. Bradley*, 433 U.S. 267, 281, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977), *quoting Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). This is plainly an instance of such a failure by state authorities. While the court must hesitate to thrust itself unnecessarily into the functioning of a correctional institution, it has a duty to order equitable relief "commensurate with the violation ascertained." *Columbus Board of Education v. Penick*, 443 U.S. 449, 465, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979).

To correct promptly the constitutional violations established on the record, while simultaneously avoiding unnecessary judicial involvement in the day-to-day work of administering a correctional institution, the court makes the following simple order:

1. The defendants shall reduce the nighttime population of the HCCC to 390

---

A communicable disease is a disease, the infectious agent of which may pass or be carried, directly or indirectly, from the body of one person or animal to the body of another person or animal. The term communicable disease embraces the common term[s] contagious and infectious disease.

The defendants' strained interpretation of section 19–13–A10(2) thus directly conflicts not only with that section's wording, but also with the definitional section applicable to it.

22. Because the practice indiscriminately creates a threat to the health of all inmates, whether or not they have been convicted of a crime, the due process standard governs the constitutional question as to both pretrial detainees and sentenced inmates. *See* note 7, *supra*. However, the dangerously inadequate medical practice at issue here would surely violate the Eighth Amendment as well, for it is "sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). *See Morales Feliciano v. Romero Barcelo*, Civ. No. 79–4 (D.P.R. Sept. 5, 1980). In *Todaro v. Ward*, 431 F.Supp. 1129, 1138 (S.D.N.Y.), *aff'd on other grounds*, 565 F.2d 48 (2d Cir. 1977) the court held that although the failure to perform examinations of inmates shortly after their admission was contrary to generally accepted procedures, and was not justified by the state, it did not violate the Eighth Amendment rights of inmates in the absence of proof that infection was thereby introduced into the prison population. This case is factually distinguishable from *Todaro*. In that case, the court held constitutional the delayed administration of a full physical examination where a nurse performed more limited screening examinations (including the taking of medical histories, the taking and recording of vital signs, and the administration of urinalysis and tests for gonorrhea) of all inmates on the day of their admission. *See Todaro v. Ward, supra*, 431 F.Supp. at 1137–38. No such day-of-admission examinations are performed by medical personnel at the HCCC, *see* Findings of Fact, ⁋ 107, and inmates at the HCCC are therefore exposed to a greater degree of risk of exposure to communicable diseases than were the inmates in *Todaro*.

inmates no later than February 13, 1981. By that date no inmate shall share a cell with any other inmate, no inmate who is not ill shall be placed in the hospital area, and no inmate shall sleep in the "fishtank" or other "dayroom" areas. The maximum number of inmates housed at the HCCC after February 13, 1981 shall remain 390, unless the court orders otherwise.

2. By January 29, 1981, the defendants shall institute procedures for (a) conducting medical examinations and tests which identify those newly admitted inmates who may have a communicable disease, and (b) isolating such inmates from other inmates.

3. The defendants shall certify their compliance with ¶¶ 1 and 2 of the court's order in affidavits, to be prepared by either the warden of the HCCC or the Commissioner of the Department of Correction, and filed with the court no later than February 2, 1981 (as to ¶ 2) and February 20, 1981 (as to ¶ 1).

The court's order is limited to ensuring that the overpopulation of the HCCC is cured and that adequate medical screening procedures are implemented. Because the details of correctional administration are not properly matters within the court's province, the specific means to which the defendants may resort to comply with this order are not for the court to determine.[23] However, the court assumes that the professional administrators of the HCCC and the Connecticut Department of Correction will exercise their judgment and discretion in a manner which will protect the constitutional rights of the inmates at the HCCC without jeopardizing the safety and welfare of the community.

The court notes that at oral argument and in their written submissions counsel for the defendants contended that the inevitable result of any order limiting the HCCC's population to its design capacity would be the unwarranted release into the community of numerous inmates who had been committed to the defendant's custody by the courts of the State of Connecticut.[24] While this prospect is an alarming one, the defendants have not in fact established that the release of any inmates from their correctional system would result from such an order; all that they have offered in support of the fearsome specter of inmates turned loose to victimize the innocent people of the state are the bare statements of counsel. The court neither orders nor expects the release of inmates who may pose a danger to the community. In view of the options available to the state to remedy conditions found unconstitutional by the court—options clearly within the reach of state officials—the responsibility for the release into the community of any potentially dangerous inmates rests squarely on the shoulders of the state officials whose actions, inaction or abdication of public trust lead to any such release.

It is the Commissioner's duty to provide secure facilities for the confinement of all inmates remanded to his custody by the courts of Connecticut, and to do so in a manner consistent with the Constitution of the United States. Notwithstanding the defendants' unusual request that this federal court take responsibility for running their institutions,[25] it is up to the defendants, and particularly the Commissioner, to ensure that the people of Connecticut are protected from those who have been adjudicated to have violated the criminal laws; that persons held pending trial be kept in secure facilities, so that the state will be certain that they will appear at trial; and that the institutions used to house inmates be maintained in compliance with minimal

---

**23.** The court declines the invitation—surprisingly, made by the *defendants*—that it devise a comprehensive plan to "provide the mechanism whereby the Commissioner could administer such an order." Tr. 121.

**24.** *See* Tr. 121, 123; Defendants' Objections to Plaintiffs' Proposed Remedial Order, filed Oct. 14, 1980 ("Defendants' Objections"), pp. 7–8.

**25.** *See* note 23, *supra.* The court notes that the period in which the defendants must make adjustments to comply with this order is limited to no more than a year, until the long-planned Cheshire Correctional Institution is opened. *See* Tr. 135–36.

constitutional standards. The means of fulfilling all of these responsibilities, including avoiding the fearsome possibilities raised by the state, are available. How the defendants employ those means, in consultation with all relevant branches of the state government, is not this court's concern. But it should be clearly understood that a default by the state government in meeting its constitutional obligations might subsequently require this court to consider such additional remedial action as will vindicate the demands of our Constitution.[26] The court assumes and expects that the defendants will continue to perform their responsibilities with professionalism and good faith,[27] and that their response to this order will protect both the public safety and the rights secured to the plaintiffs by the Constitution.

---

**26.** Although the injunctive relief ordered by the court is directed only to the defendants, Commissioner Manson and Warden Wezowicz, under Rule 65(d), Fed.R.Civ.P., their officers, agents, servants, employees and attorneys, as well as those persons who are in active conduct or participation with them and who receive actual notice of the order, are also bound by the court's order. Moreover, in the unlikely event that it becomes necessary to bind other state officials in order to cure the violations of the Constitution at the HCCC, the court has ample power to bring them into this litigation and make appropriate orders for further injunctive relief, or they may be made parties to a subsequent action to enforce the order in these cases. *See generally* O. Fiss, Injunctions 625–29, 645–75 (1972); *Lee v. Macon County Board of Education*, 267 F.Supp. 458, 479 (M.D.Ala.) (three-judge court) (per curiam), *aff'd per curiam sub nom. Wallace v. United States*, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967).

**27.** *See* Defendants' Objections, p. 4.